Charles A. Isely, WSBA #34130
charles@iselylaw.com
Charles A. Isely, Attorney at Law, P.C.
205 E 11th St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200 (p) / (360) 567-0165
Of Attorneys for Plaintiff

John L. Green, WSBA #35483
jack@greenandritchie.com
Green, Ritchie & Bogar, PLLC
1601 Lincoln Ave.
Vancouver, WA  986660-2758
(360) 694-8718 (p) / (360) 693-7081 (f)
Of Attorneys for Plaintiff

THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | | |
|---|---|---|
| RICHARD E. KNAPP, | ) | |
| | ) | |
| Plaintiff, | ) | No. |
| | ) | |
| v. | ) | COMPLAINT FOR DAMAGES |
| | ) | |
| DUSTIN GOUDSCHAAL, in his individual | ) | DEMAND FOR JURY TRIAL |
| capacity, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

COMES NOW, Plaintiff, Richard E. Knapp, by and through his attorneys of record,

Charles A. Isely of Charles A. Isely, Attorney at Law, P.C. and John L. Green of Green, Ritchie

& Bogar, PLLC, and alleges as follows:

## I.    PARTIES

1.1    Plaintiff, Richard E. Knapp, a resident of Clark County, Washington.

COMPLAINT - 1

Charles A. Isely, Attorney at Law, P.C.
205 E 11th St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200

1.2     Defendant Dustin Goudschaal, a commissioned law enforcement officer for the city of Vancouver, WA, named in his individual capacity, believed to be a resident of Clark County, Washington.

## II.     JURISIDCTION, VENUE and TIMELINESS

2.1     Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over Plaintiff's claims against Defendant, in his individual capacity, for violations of Plaintiff's Fourth Amendment rights as guaranteed by the Fourteenth Amendment.

2.2     28 U.S.C. § 1331 and § 1343(a) provides this Court with subject matter jurisdiction over Plaintiff's 42 U.S.C. § 1983 claims against Defendant, in Defendant's individual capacity, for a violation of Plaintiff's Fourth Amendment rights, while acting under color of state law.

2.3     The Court has personal jurisdiction over Defendant, as the acts which provide the basis for Plaintiff's claims occurred in the city of Vancouver, Clark County, Washington.  The Defendant is also domiciled in Clark County, Washington.

2.4     Venue is proper in the United States District Court for the Western District of Washington at Tacoma, pursuant to 28 U.S.C. § 1391(b)(1) and (2).

2.5     This action is timely pursuant to Wash. Rev. Code § 4.16.090.

## III.     FACTS

3.1     In October 2018, Defendant, while employed as a Detective for the Vancouver Police Department, became one of the lead investigators of the unsolved murder of Audrey A. Frasier.  Frasier was found dead in her Vancouver, WA apartment on July 17, 1994.  She died by strangulation.  Her death was ruled a homicide.

3.2     As a new investigator on the unsolved Frasier case, Defendant familiarized

COMPLAINT - 2

Charles A. Isely, Attorney at Law, P.C.
205 E 11th St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200

himself with the extensive case file.  Defendant reviewed the written reports and work of

previous homicide detectives, and Defendant, along with other members of his department,

engaged in additional witness interviews and commissioned additional forensic analysis.

3.3     On April 28, 2019, Defendant and Vancouver Police Detective Neil Martin

arrested Plaintiff, Richard E. Knapp, in Oregon for Frasier's murder.

3.4     On April 29, 2019, the Clark County Prosecuting Attorney's Office charged

Plaintiff with First Degree Murder with Sexual Motivation and Second Degree Murder with

Sexual Motivation.

3.5     On April 29, 2019, the Honorable Suzan Clark, Clark County Superior Court

Judge, found probable cause to arrest and detain Plaintiff for Frasier's murder, based upon

Defendant's Declaration of Probable Cause (hereinafter the "Declaration"), which was filed

contemporaneously with the Prosecutor's Motion for Warrant of Arrest (for First Degree

Murder with Sexual Motivation and Second Degree Murder with Sexual Motivation).

3.6     The Court's determination of probable cause for Plaintiff's arrest and detention

triggered the setting of bail conditions.  The Court initially denied bail.  Subsequent to April 29,

2019, the Court set bail at $1.0 million dollars.  At no time during his detention did Plaintiff

have the means to make bail.

3.7     On April 30, 2019, Defendant submitted an Affidavit in Support of Search

Warrant to the Honorable Chad Sleight, Clark County District Court Judge, seeking a search

warrant to collect buccal cells (oral swabs) from Plaintiff to facilitate DNA and biological

analysis (hereinafter the "Affidavit").  Judge Sleight, in reliance upon Defendant's Affidavit,

authorized Defendant's requested warrant the same day.  Defendant executed the warrant less

than two (2) hours after its issuance.

COMPLAINT - 3

Charles A. Isely, Attorney at Law, P.C.
205 E 11th St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200

3.8     On November 30, 2022, after Plaintiff spent 1,312 uninterrupted days in custody from the date of his arrest, the Court dismissed all charges against him, without prejudice, pursuant to the prosecution's motion.  Clark County Prosecuting Attorney Tony Golik said his office was "no longer convinced beyond a reasonable doubt, based on the evidence we have and we understand it now, that Mr. Knapp could be convicted."

3.9     The evidence known and available to Defendant, as of the date of Plaintiff's arrest, let alone on November 30, 2022, demonstrates Plaintiff should never have been arrested in the first place.  Defendant and his partner arrested Plaintiff without probable cause.

3.10    In between the date of Plaintiff's arrest, on April 28, 2019, and his release on November 30, 2022, Plaintiff's life was destroyed, and he suffered severe emotional distress and trauma.  He lost everything that was important to him: his job, his friends, and his home. During Plaintiff's time in custody, Plaintiff's wife was terminally ill.  Plaintiff's attempts to see and hold his wife prior to her death were denied in a two-sentence order.  She passed in June 2021 while Plaintiff sat in Clark County Jail awaiting trial.  And while Plaintiff welcomed his freedom, the Prosecution's dismissal has not removed the cloud of suspicion that remains over Plaintiff to this day.

3.11    Plaintiff's injuries were entirely unnecessary, and they are the direct result of Defendant's actions.  In the Declaration and Affidavit, Defendant made deliberately false statements or omissions, or Defendant recklessly disregarded the truth.  Defendant failed to include evidence and disclosures any competent or reasonable police officer would have known the Court would have wanted to consider prior to the issuance of a search warrant or prior to deciding whether to enter an order to arrest and detain Plaintiff.

COMPLAINT - 4

Charles A. Isely, Attorney at Law, P.C.
205 E 11th St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200

3.12     Defendant's deliberately false statements or omissions, or Defendant's reckless disregard for the truth, were material.  But for Defendant's deliberately false statements or omissions, or but for Defendant's reckless disregard for the truth, Judge Clark would not have found probable cause to issue an order for Plaintiff's arrest and detention; and Judge Sleight would not have authorized the search warrant.

## IV.     DELIBERATELY FALSE STATEMENTS or OMISSIONS; OR RECKLESS DISREGARD for the TRUTH in the DECLARATION of PROBABLE CAUSE in SUPPORT of ARREST WARRANT

Plaintiff quotes the narrative from Defendant's Declaration, in its entirety, with Plaintiff's identification of specific instances where Defendant deliberately makes false statements or omissions, or where Defendant recklessly disregards the truth, after each excerpt.  Plaintiff emphasizes the cited deliberately false statements or omissions, or reckless disregard of the truth, after each Declaration excerpt are not exhaustive.  More importantly, they are drawn from information in the Frasier case file that was compiled by Defendant and other members of the Vancouver Police Department *before Plaintiff's arrest*.  Therefore, Defendant had full knowledge of this information before Defendant and his partner arrested Plaintiff and before Defendant submitted his Declaration to the Court.  A true and correct copy of Defendant's Declaration is attached to and incorporated by reference into this Complaint as **Exhibit A**.

\\\\\

\\\\\

\\\\\

\\\\\

COMPLAINT - 5

Charles A. Isely, Attorney at Law, P.C.
205 E 11th St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200

4.1     **"On the evening of July 17th, 1994 patrol units with the Vancouver Police Department (VPD) responded to a 911 call of a possible death at 8011 E Fourth Plain Boulevard #F11 (Family Tree Apartments). The 911 caller (later identified as Scott Hinshaw) reported that a known acquaintance named Audrey Frasier, could be seen from an exterior window lying on her bed naked and was not responding to knocks on the door."**

Deliberately False Statements or Omissions; or Reckless Disregard of the Truth:

4.1.1     In his Declaration, Defendant makes no mention that Hinshaw admitted to being drunk and naked with Frasier in Frasier's apartment, touching her "chest" and kissing her abdomen, sometime after 2:00 a.m. on July 17, 1994.  Defendant makes no mention of the fact that Hinshaw admitted to manipulating the crime scene prior to arrival of investigating officers on July 17, 1994.  Defendant fails to mention that Hinshaw's DNA (i.e., seminal fluid) was found on the comforter underneath Frasier's body.  Defendant portrays Hinshaw as merely a fact witness; a concerned neighbor who called the police.  In fact, Hinshaw was (and remains) a prime suspect in Frasier's murder.

4.1.2     Detective Wally Stefan was one of the original officers who investigated Frasier's murder.  On July 18, 1994, Detective Stefan and his partner interviewed Hinshaw at a Vancouver Police precinct.  Detective Stefan stated in his report that "HINSHAW gave investigators every impression, throughout the interview, he was being deceptive."

4.1.3     Hinshaw also lived at the Family Tree Apartments.  Hinshaw admitted to drinking beer with Frasier, in her apartment, during the afternoon on Saturday, July 16, 1994.

COMPLAINT - 6

Charles A. Isely, Attorney at Law, P.C.
205 E 11th St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200

4.1.4    According to Hinshaw, he went to a bar early Saturday evening, and Frasier stayed in her apartment until approximately 2100 hours that day.  Detective Stefan notes "[Hinshaw] did not say how he knew this."

4.1.5    Hinshaw told Detective Stefan he returned from the bar at approximately 2:00 a.m. to 2:30 a.m. the morning of July 17, 1994.

4.1.6    Hinshaw admitted to drinking at several bars, and that he was "drunk."

4.1.7    Hinshaw stated Frasier came home after he did.  She went to Hinshaw's apartment.  Hinshaw then told Detective Stefan he and Frasier went to Frasier's apartment.  Hinshaw described Frasier as "not sober."

4.1.8    Frasier had her bed in her apartment's living room.  Hinshaw recounts he laid on the right side of the bed while Frasier spoke on the phone.

4.1.9    "[Hinshaw] said he was lying on the right side of FRASIER's bed, the side of the bed which was closest to the kitchen.  While inside her apartment, after she used the phone, HINSHAW stated FRASIER disrobed.  He told detectives FRASIER took her clothes off, she stated that she did not want to have sex."  Hinshaw informed detectives, initially, he was only wearing a pair of shorts.

4.1.10  In response to a question from Detective Stefan, Hinshaw recounts he had had sex with Frasier only once before, a couple of months before Frasier's death.

4.1.11  While lying on Frasier's bed, Hinshaw claims he heard a knock at the door, and Frasier said "My pot is here."  Hinshaw then told Detective Stefan he took a blanket from Frasier's bed and fled out the apartment's back door.  Hinshaw states he then went to bed.

COMPLAINT - 7

Charles A. Isely, Attorney at Law, P.C.
205 E 11th St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200

1    4.1.12  Hinshaw then told Detective Stefan he returned to Frasier's apartment

2 between the hours of 12:00 p.m. and 12:30 p.m. on July 17, 1994.  There was no answer.

3 Hinshaw assumed Frasier "took off" with whoever knocked on her door earlier that day.

4    4.1.12.1  Hinshaw called 911 at approximately 7:45 p.m. on July 17,

5 1994.

6    4.1.13  Detective Stefan stated "HINSHAW's account of what happened

7 Saturday night was disjointed.  Throughout the interview with HINSHAW, Detectives had to

8 go through HINSHAW's statements to have him clarify his incomplete answers so detectives

9 could assemble a clear, and chronological, account of his actions during the time he was

10 with FRASIER."

11

12    4.1.14  After detectives informed Hinshaw that there was forensic evidence at

13 the scene and asked why fingerprints and a hair were found on Frasier's chest and abdomen,

14 Hinshaw admitted to touching Frasier's chest and to kissing her abdomen.  When asked if it

15 was possible his fingerprints could be found on Frasier's neck, Hinshaw answered his hand

16 may have touched Frasier's neck when he moved to touch her chest.

17    4.1.15  Hinshaw *then* admits to taking his clothes off when Frasier disrobed.

18    4.1.16  "Hinshaw said he took his shorts off in FRASIER's apartment.  He

19 was asked if he had sex with FRASIER that night.  He said he couldn't remember.

20 FRASIER [*sic*] said he would have used a condom if he was going to have sex with the

21 decedent."

22

23    4.1.17  "HINSHAW made the statement to detectives; 'I know I didn't have

24 sex with her.'  He seemed adamant that he didn't [have] sex with FRASIER.  Detectives

25

COMPLAINT - 8

Charles A. Isely, Attorney at Law, P.C.
205 E 11th St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200

1  informed HINSHAW that his statements were very vague.  He responded by saying: 'I'm

2  telling you as much as I remember.'"

3      4.2      **"Patrol units arrived at the location and found no open ingress into the**

4  **residence as the front door and rear sliding glass door were locked.  Patrol units could**

5  **see the naked female from a window and also could not rouse her. The patrol units**

6  **subsequently forced the front door open to the apartment.  Officers were quickly able**

7  **to determine that the female, identified as Aubrey Frasier, was deceased."**

8      Deliberately False Statements or Omissions; or Reckless Disregard of the Truth:

9      4.2.1    In his Declaration, Defendant omits the fact that Hinshaw admitted to

10  altering the crime scene on July 17, 1994 *after the police first arrived at Frasier's*

11  *apartment*. While officers secured the front of Frasier's apartment, Hinshaw was busy

12  shoving a comforter he took Frasier's apartment through a window from Frasier's back

13  patio, knocking over a potted plant inside the apartment.  Hinshaw returned the comforter so

14  hurriedly that he failed to notice he dumped some of his clothes (which were presumably

15  wrapped in the comforter) on Frasier's patio.

16      4.2.2    According to Detective Stefan, "There was a question whether the

17  rear sliding patio window of FRASIER's apartment was open, or closed, when one of the

18  first responding officers (VPD Uniform Officer Skarpho) arrived.  Officer Skarpho told

19  [Detective Stefan] that at the time he arrived, he was escorted to the rear of FRASIER'S

20  apartment, by HINSHAW.  Officer Skarpho told [Detective Stefan] the rear window was

21  closed and the mini-blinds on this window were closed."  However, Officer Skarpho

22  reported he could see Frasier lying on the bed between a gap between the bottom of the

23  window's blind and the window sill.

COMPLAINT - 9

Charles A. Isely, Attorney at Law, P.C.
205 E 11th St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200

4.2.2.1 Hinshaw himself reported he saw Frasier from the rear patio through this same gap between the blind and the window sill before calling 911 at approximately 7:45 p.m. on July 17, 1994.

4.2.3   "However, at the time [Detective Stefan] first entered the victim's apartment, [Detective Stefan] noticed that the rear patio window blinds were closed.  The bottom of the blind was touching the window sill.  The sliding window was open.  On the floor, below the window, [Detective Stefan] saw what appeared to be a small plant that had fallen on the floor.  It appeared the plant had been sitting on the window sill and had been knocked off the sill."

4.2.4   "After seeing this [Detective Stefan] went outside and questioned Officer Skarpho about how he could have seen the victim lying on the bed from outside the apartment.  It was at this time Officer Skarpho said the window was closed and the window shade was not fully extended to the window sill."

4.2.5   Detective Stefan noted the officers who first responded to Hinshaw's 911 call positioned themselves in the front of Frasier's apartment.  Not the rear.  When Detective Stefan questioned Hinshaw, on July 18, 1994, on the discrepancies between his observations of the window sill and window and Officer Skarpho's observations, Hinshaw "told detectives that he shoved a blanket through the rear patio window of FRASIER's apartment.  He said the rear window was open, 'all the way.'  HINSHAW told detectives after he discovered FRASIER, he shoved the blanket (which [he] had taken from FRASIER'S apartment early Sunday morning) through FRASIER'S patio window.  He said he put the blanket into FRASIER'S apartment shortly before he called 911."

COMPLAINT - 10

Charles A. Isely, Attorney at Law, P.C.
205 E 11th St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200

4.2.6    Hinshaw stated the plant on the sill may have fallen over, and he estimated he shoved the blanket through the window five to ten minutes before calling 911.

4.2.7     Hinshaw went on to admit he called his brother before calling 911. When asked for his brother's phone number, Hinshaw stated he did not have it memorized. When asked why he called his brother before calling the police about Frasier, Hinshaw explained he brother had experience in such an area because Hinshaw's brother had once found a dead person.

4.2.8    In addition to the blinds, the window, and the blanket shoved back into Frasier's apartment, Detective Stefan noted a further discrepancy related to clothing found on Frasier's back patio.  "When HINSHAW was questioned about the clothes which were found by police on the decedent's patio, he said the clothes found outside could have been wrapped in the blanket which he took from FRASIER'S apartment early Sunday morning.  It should be noted, Officer Skarpho told [Detective Stefan] and Detective Sundby at the time that he <u>first</u> went to the rear of FRASIER's apartment, with HINSHAW, there was <u>no</u> clothing lying on the concrete patio at the rear of FRASIER's apartment."  (emphasis in the original).

4.2.9    In response to multiple questions from Detective Stefan to try to confirm Hinshaw's chronology of events, Hinshaw admits "the initial plan was to have sex." Hinshaw said he "rubbed" Frasier's breasts.  When asked about having sex with Frasier, and Hinshaw's earlier statements that he would have used a condom, Hinshaw explained that he "was going to go back to my apartment and get a condom – I guess."

4.2.10  Hinshaw told Detective Stefan Frasier did not want to have sex on July 17, 1994, and that Hinshaw accepted Frasier's decision.

COMPLAINT - 11

Charles A. Isely, Attorney at Law, P.C.
205 E 11th St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200

4.2.11   When detectives asked Hinshaw what his response would be if the medical examiner narrowed Frasier's time of death between 0200 hours and 02300 hours Sunday morning, Hinshaw responded by saying: "Then I'm fucked – aren't I."

4.2.12   When officers took Hinshaw back to his apartment after the July 18, 1994 police interview, Hinshaw spontaneously commented that detectives could not help him anyway.

4.3   **"Detectives responded to the scene and began processing the area for evidence. Detectives noted that Audrey Frasier was lying on her back, completely naked, on a water bed located within the living room of the apartment. The victim showed visible signs of recent sexual contact (intercourse) as what appeared to be semen was located around her vaginal area along with vaginal bleeding."**

Deliberately False Statements or Omissions; or Reckless Disregard of the Truth:

4.3.1   Dr. Archie Hamilton, former Clark County, WA Medical Examiner, conducted an autopsy of Frasier at approximately 3:15 p.m. on July 18, 1994.

4.3.2   Dr. Hamilton made no note of semen found outside of Frasier's body: "The external genitalia are those of an adult female.  There is trace of blood extending from the vaginal vault over the inner cheeks.  There is no trauma to the vulva or adjacent structures."  Later in his report, Dr. Hamilton states "[t]here are no injuries to the labia major, labia minora or other soft tissue of the vulva.  The vaginal vault is examined with a speculum, revealing a small amount of thick, whitish/yellow, mucoid material which is blood-stained.  There are no lacerations, contusions or abrasions of the vaginal vault.  The cervix uteri is hemorrhagic and contains a minute amount of bright red blood within the endocervical canal."

COMPLAINT - 12

Charles A. Isely, Attorney at Law, P.C.
205 E 11th St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200

1         4.3.3   Detective Stephan made no note of semen when he examined

2 Frasier's body at the crime scene. "The external opening of the victim's vagina seemed to

3 be moist, upon visual inspection, giving R/O suspicion that the victim may have had

4 intercourse recently, due to the possible excretions present."

5         4.4    **"Detectives also noted that the victim had several contusions on the**

6 **anterior portion of her neck and had what appeared to be petechial about her eyes**

7 **along with a bruise on her left lower thigh. During the investigation, detectives**

8 **collected a variety of DNA evidence including but not limited to; vaginal and anal**

9 **swabs, fingernail scrapings, saliva samples and dried secretions."**

10

11         4.4.1   Dr. Hamilton also noticed a puncture wound on Frasier's right mid

12 tibia.

13         4.5    **"An autopsy was performed on the victim on July 18th, 1994 by Dr.**

14 **Archie Hamilton who concluded that cause of death was strangulation and that the**

15 **manner of death was homicide. Dr. Archie Hamilton noted 'multiple contusions of the**

16 **skin, soft tissue of the neck and thyroid gland' and an 'acute fracture of the tip of the**

17 **greater horn of the hyoid bone' consistent with a strangulation. An intrapelvic**

18 **hemorrhage was also noted that involved the uterus, fallopian tubes, uterosacral**

19 **ligaments and pervesical soft tissue which was consistent with a sexual assault."**

20         <u>Deliberately False Statements or Omissions; or Reckless Disregard of the Truth</u>:

21

22         4.5.1   Dr. Hamilton does not use the words "sexual assault" in his autopsy

23 report; nor does Dr. Hamilton make any finding of a sexual assault.

24

25

COMPLAINT - 13

Charles A. Isely, Attorney at Law, P.C.
205 E 11th St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200

4.6   **"Dr. Archie Hamilton concluded that all of the noted injuries 'appear to have occurred in the same time frame and are acute'."**

<u>Deliberately False Statements or Omissions; or Reckless Disregard of the Truth</u>:

4.6.1   Dr. Hamilton notes the "injuries" to Frasier appear to have occurred in the same "time frame and are acute."  However, Dr. Hamilton does not define what he means by "time frame."

4.6.2   Dr. Hamilton mentions only "injuries" as appearing to have occurred in the same "time frame."  He does not find, nor mention, that any DNA found on or inside Frasier's body occurred within this same "time frame."  DNA from semen, for example, may be detected inside the vaginal vault for several days after intercourse.

4.6.3   Furthermore, an "acute" injury refers to an injury that has not begun the healing process.  Dr. Hamilton identified a fracture at the tip of the greater horn on Frasier's hyoid bone.  This fracture will cause death within minutes or even seconds.  The injuries noted on Frasier's pelvis, however, could have occurred days before the hyoid bone fracture.

4.6.4   Defendant was aware that Frasier struggled with drug and alcohol abuse, and that it was not uncommon for Frasier to engage in causal sexual encounters.

\\\\\
\\\\\
\\\\\
\\\\\
\\\\\
\\\\\

COMPLAINT - 14

Charles A. Isely, Attorney at Law, P.C.
205 E 11th St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200

4.7    **"During the course of the initial investigation, several suspects were developed but were eliminated as being the source of the DNA evidence (semen and fingernail scrapings from the victim).  The DNA located in the semen and fingernail scrapings matched and were thereby listed as unknown person; 'Individual A'. Over the course of several years, numerous persons of interest were developed and tested against 'Individual A' with negative results as well as the sample being uploaded into the Combined DNA Index System (CODIS) with negative net results."**

Deliberately False Statements or Omissions; or Reckless Disregard of the Truth:

4.7.1    Defendant fails to mention the Hinshaw's DNA (i.e., seminal fluid) was found on Frasier's comforter which was located underneath Frasier's body.

4.8    **"Investigative efforts continued with advances in forensic science and in 2018 a person of interest was developed named Richard Eugene Knapp. Richard Knapp was known to live in the Clark County, Washington area during the time of the homicide (1994)."**

4.8.1    Plaintiff admits Defendant and other members of the Vancouver Police Department identified Plaintiff through the use of genealogical research and DNA.

4.9    **"Richard Knapp had a previous sexual assault conviction in Clark County, Washington in 1986 for which he pled guilty."**

Deliberately False Statements or Omissions; or Reckless Disregard of the Truth:

4.9.1    Plaintiff did not plead guilty.  The Prosecuting Attorney's Office charged Plaintiff with Rape in the Third Degree (no forcible compulsion or threat of violence).  At no time was Plaintiff charged with Rape in the First Degree or Rape in the Second Degree.  Plaintiff maintained his innocence, but a jury found Plaintiff guilty.

COMPLAINT - 15

4.9.2    During the course of the trial, the victim took the stand.  She did not testify to strangulation or violence by Plaintiff.

4.9.3    At sentencing, the Court imposed sixty (60) days of jail time.

4.10    **"The victim in that case was contacted and stated that during this assault in 1986, Richard Knapp had strangled her to the point of near unconsciousness."**

Deliberately False Statements or Omissions; or Reckless Disregard of the Truth:

4.10.1  On October 30, 2018, Defendant's colleague, Detective Neil Martin of the Vancouver Police Department, interviewed the victim of the 1986 case.

4.10.2  The victim never used the word "strangulation", nor did she testify to strangulation at trial.  Here is the relevant exchange between the investigating officer and the victim during the October 30, 2018 interview:

Q.  When he was, ah, when he had his hand on your throat, did that, were you able to breath still?

A.  [Unintelligible] . . . Um, a few times I had problems breathing, and I got dizzy and stuff, but he loosened up, you know, he didn't do it to where I passed out and things like that. So.

Q.  OK, but, did he squeeze you, so, but he squeezed you with enough force to cause you to get dizzy?

A.  Yes.

4.11    **"Richard Knapp was commanded by court order to give a biological sample which was obtained but never uploaded into any database and destroyed in 2000."**

4.11.1  This statement is correct.

\\\\\

\\\\\

COMPLAINT - 16

4.12   **"Covert surveillance was conducted on both the home and place of work of Richard Knapp in order to obtain a discarded item that might contain DNA evidence for comparison. A cigarette butt, placed into a receptacle outside Richard Knapp's place of employment, was seized and subsequently analyzed by the WSP Crime Laboratory. The DNA located in the cigarette butt matched that of unknown person 'Individual A', indicating that Richard Knapp was the source DNA at the original homicide crime scene (semen and skin cells underneath the victim's nails)."**

Deliberately False Statements or Omissions; or Reckless Disregard of the Truth:

4.12.1  In a report from the Washington State Patrol's Crime Laboratory, dated August 24, 2017, Plaintiff's DNA was found in Frasier's vaginal vault and underneath her fingernails, and Plaintiff's DNA was found in one stain on Frasier's comforter.

4.12.2  Defendant fails to mention the August 24, 2017 report also identifies Hinshaw's DNA (i.e., seminal fluid) on a separate stain on the same comforter.

4.13   **"On 04/29/19, Vickie Kyllo, a residence [*sic*] of the same apartment complex during the time period of the homicide, was contacted and shown a 1994 photograph of Richard Knapp. Vickie Kyllo stated that she 'may have seen him around the apartment complex'."**

Deliberately False Statements or Omissions; or Reckless Disregard of the Truth:

4.13.1  Defendant omits the fact that Kyllo and Plaintiff resided in a *Kelso, WA apartment complex* for almost seven years between 2010 and 2017.  Kelso, WA is over forty miles from Frasier's apartment complex.

4.13.2  Defendant omits the fact that Kyllo never identified Plaintiff as a possible suspect in Frasier's murder.

COMPLAINT - 17

Charles A. Isely, Attorney at Law, P.C.
205 E 11ᵗʰ St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200

4.13.2  Defendant omits that Kyllo was arrested for burglarizing Frasier's apartment in the days after her death; and that Kyllo identified her husband as a potential killer.

4.13.3  When interviewing Kyllo to determine whether she recognized Plaintiff, Defendant showed Kyllo still pictures of individuals attending Frasier's funeral. When Defendant showed Kyllo a picture of Knapp, it was a booking photo.

4.14  **"All of the above described incidents took place within Clark County, Washington and within jurisdiction of this court."**

4.14.1  Plaintiff reincorporates by reference the previously cited material misstatements and omissions from the Declaration into this section.

## V.   DELIBERATELY FALSE STATEMENTS or OMISSIONS; OR RECKLESS DISREGARD for the TRUTH in the AFFIDAVIT in SUPPORT of SEARCH WARRANT

5.1    After Defendant was already taken into custody, Defendant submitted an affidavit in support of search warrant, dated April 30, 2019 (the "Affidavit"), to a Judge Sleight in order to obtain oral swabs to conduct DNA and biological analysis.  In reliance upon Defendant's Affidavit, Judge Sleight signed the search warrant the same day.  Defendant executed the warrant less than two (2) hours after the search warrant's issuance.

5.2    Unlike the Declaration, Defendant provided information to the Court, regarding Defendant's expertise, training and experience.  A true and correct copy of the Affidavit is attached to and incorporated by reference into this section as **Exhibit B**.

5.3    Plaintiff quotes the narrative from Defendant's Affidavit, in its entirety, with Plaintiff's identification of specific instances where Defendant deliberately makes false statements or omissions, or where Defendant recklessly disregards the truth, after each excerpt.

COMPLAINT - 18

Plaintiff emphasizes the cited deliberately false statements or omissions, or reckless disregard of the truth, after each Affidavit excerpt are not exhaustive.  More importantly, they are drawn from information in the Frasier case file that was compiled by Defendant and other members of the Vancouver Police Department *before* Defendant made application for the warrant.  Therefore, Defendant had full knowledge of this information before Defendant and his partner arrested Plaintiff and before Defendant submitted his Affidavit to the Court.

5.4     **"On the evening of July 17th, 1994 patrol units with the Vancouver Police Department (VPD) responded to a 911 call of a possible death at 8011 E Fourth Plain Boulevard #F11 (Family Tree Apartments). The 911 caller (later identified as Scott Hinshaw) reported that a known acquaintance named Audrey Frasier, could be seen from an exterior window lying on her bed naked and was not responding to knocks on the door."**

Deliberately False Statements or Omissions; or Reckless Disregard of the Truth:

5.4.1     In his Affidavit, Defendant makes no mention that Hinshaw admitted to being drunk and naked with Frasier in Frasier's apartment, touching her "chest" and kissing her abdomen, sometime after 2:00 a.m. on July 17, 1994.  Defendant makes no mention of the fact that Hinshaw admitted to manipulating the crime scene prior to arrival of investigating officers on July 17, 1994.  Defendant fails to mention that Hinshaw's DNA (i.e., seminal fluid) was found on the comforter underneath Frasier's body.  Defendant portrays Hinshaw as merely a fact witness; a concerned neighbor who called the police.  In fact, Hinshaw was (and remains) a prime suspect in Frasier's murder.

5.4.2     Detective Wally Stefan was one of the original officers who investigated Frasier's murder.  On July 18, 1994, Detective Stefan and his partner

COMPLAINT - 19

Charles A. Isely, Attorney at Law, P.C.
205 E 11th St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200

interviewed Hinshaw at a Vancouver Police precinct.  Detective Stefan stated in his report

that "HINSHAW gave investigators every impression, throughout the interview, he was

being deceptive."

        5.4.3    Hinshaw also lived at the Family Tree Apartments.  Hinshaw admitted

to drinking beer with Frasier, in her apartment, during the afternoon on Saturday, July 16,

1994.

        5.4.4    According to Hinshaw, he went to a bar early Saturday evening, and

Frasier stayed in her apartment until approximately 2100 hours that day.  Detective Stefan

notes "[Hinshaw] did not say how he knew this."

        5.4.5    Hinshaw told Detective Stefan he returned from the bar at

approximately 2:00 a.m. to 2:30 a.m. the morning of July 17, 1994.

        5.4.6    Hinshaw admitted to drinking at several bars, and that he was

"drunk."

        5.4.7    Hinshaw stated Frasier came home after he did.  She went to

Hinshaw's apartment.  Hinshaw then told Detective Stefan he and Frasier went to Frasier's

apartment.  Hinshaw described Frasier as "not sober."

        5.4.8    Frasier had her bed in her apartment's living room.  Hinshaw recounts

he laid on the right side of the bed while Frasier spoke on the phone.

        5.4.9    "[Hinshaw] said he was lying on the right side of FRASIER's bed, the

side of the bed which was closest to the kitchen.  While inside her apartment, after she used

the phone, HINSHAW stated FRASIER disrobed.  He told detectives FRASIER took her

clothes off, she stated that she did not want to have sex."  Hinshaw informed detectives,

initially, he was only wearing a pair of shorts.

COMPLAINT - 20

Charles A. Isely, Attorney at Law, P.C.
205 E 11th St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200

1        5.4.10   In response to a question from Detective Stefan, Hinshaw recounts he

2   had had sex with Frasier only once before, a couple of months before Frasier's death.

3        5.4.11   While lying on Frasier's bed, Hinshaw claims he heard a knock at the

4   door, and Frasier said, "My pot is here."  Hinshaw then told Detective Stefan he took a

5   blanket from Frasier's bed and fled out the apartment's back door.  Hinshaw states he then

6   went to bed.

7        5.4.12   Hinshaw then told Detective Stefan he returned to Frasier's apartment

8   between the hours of 12:00 p.m. and 12:30 p.m. on July 17, 1994.  There was no answer.

9   Hinshaw assumed Frasier "took off" with whoever knocked on her door earlier that day.

10

11       5.4.12.1   Hinshaw called 911 at approximately 7:45 p.m. on July 17,

12  1994.

13       5.4.13   Detective Stefan stated "HINSHAW's account of what happened

14  Saturday night was disjointed.  Throughout the interview with HINSHAW, Detectives had to

15  go through HINSHAW's statements to have him clarify his incomplete answers so detectives

16  could assemble a clear, and chronological, account of his actions during the time he was

17  with FRASIER."

18       5.4.14   After detectives informed Hinshaw that there was forensic evidence at

19  the scene and asked why fingerprints and a hair were found on Frasier's chest and abdomen,

20  Hinshaw admitted to touching Frasier's chest and to kissing her abdomen.  When asked if it

21  was possible his fingerprints could be found on Frasier's neck, Hinshaw answered his hand

22  may have touched Frasier's neck when he moved to touch her chest.

23

24       5.4.15   Hinshaw *then* admits to taking his clothes off when Frasier disrobed.

25

COMPLAINT - 21

5.4.16  "Hinshaw said he took his shorts off in FRASIER's apartment.  He was asked if he had sex with FRASIER that night.  He said he couldn't remember.  FRASIER [*sic*] said he would have used a condom if he was going to have sex with the decedent."

5.4.17  "HINSHAW made the statement to detectives; 'I know I didn't have sex with her.'  He seemed adamant that he didn't [have] sex with FRASIER.  Detectives informed HINSHAW that his statements were very vague.  He responded by saying: 'I'm telling you as much as I remember.'"

5.5  **"Patrol units arrived at the location and found no open ingress into the residence as the front door and rear sliding glass door were locked.  Patrol units could see the naked female from a window and also could not rouse her. The patrol units subsequently forced the front door open to the apartment.  Officers were quickly able to determine that the female, identified as Aubrey Frasier, was deceased."**

Deliberately False Statements or Omissions; or Reckless Disregard of the Truth:

5.5.1   In his Affidavit, Defendant omits the fact that Hinshaw admitted to altering the crime scene on July 17, 1994, *after the police first arrived at Frasier's apartment*. While officers secured the front of Frasier's apartment, Hinshaw was busy shoving a comforter he took Frasier's apartment through a window from Frasier's back patio, knocking over a potted plant inside the apartment.  Hinshaw returned the comforter so hurriedly that he failed to notice he dumped some of his clothes (which were presumably wrapped in the comforter) on Frasier's patio.

5.5.2   According to Detective Stefan, "There was a question whether the rear sliding patio window of FRASIER's apartment was open, or closed, when one of the

COMPLAINT - 22

Charles A. Isely, Attorney at Law, P.C.
205 E 11th St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200

first responding officers (VPD Uniform Officer Skarpho) arrived.  Officer Skarpho told [Detective Stefan] that at the time he arrived, he was escorted to the rear of FRASIER'S apartment, by HINSHAW.  Officer Skarpho told [Detective Stefan] the rear window was closed and the mini-blinds on this window were closed."  However, Officer Skarpho reported he could see Frasier lying on the bed between a gap between the bottom of the window's blind and the windowsill.

        5.5.2.1 Hinshaw himself reported he saw Frasier from the rear patio through this same gap between the blind and the windowsill before calling 911 at approximately 7:45 p.m. on July 17, 1994.

        5.5.3   "However, at the time [Detective Stefan] first entered the victim's apartment, [Detective Stefan] noticed that the rear patio window blinds were closed.  The bottom of the blind was touching the windowsill.  The sliding window was open.  On the floor, below the window, [Detective Stefan] saw what appeared to be a small plant that had fallen on the floor.  It appeared the plant had been sitting on the windowsill and had been knocked off the sill."

        5.5.4   "After seeing this [Detective Stefan] went outside and questioned Officer Skarpho about how he could have seen the victim lying on the bed from outside the apartment.  It was at this time Officer Skarpho said the window was closed and the window shade was not fully extended to the windowsill."

        5.5.5   Detective Stefan noted the officers who first responded to Hinshaw's 911 call positioned themselves in the front of Frasier's apartment.  Not the rear.  When Detective Stefan questioned Hinshaw, on July 18, 1994, on the discrepancies between his observations of the windowsill and window and Officer Skarpho's observations, Hinshaw

COMPLAINT - 23

Charles A. Isely, Attorney at Law, P.C.
205 E 11th St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200

"told detectives that he shoved a blanket through the rear patio window of FRASIER's apartment. He said the rear window was open, 'all the way.' HINSHAW told detectives after he discovered FRASIER, he shoved the blanket (which [he] had taken from FRASIER'S apartment early Sunday morning) through FRASIER'S patio window. He said he put the blanket into FRASIER'S apartment shortly before he called 911."

5.5.6    Hinshaw stated the plant on the sill may have fallen over, and he estimated he shoved the blanket through the window five to ten minutes before calling 911.

5.5.7    Hinshaw went on to admit he called his brother before calling 911. When asked for his brother's phone number, Hinshaw stated he did not have it memorized. When asked why he called his brother before calling the police about Frasier, Hinshaw explained he brother had experience in such an area because Hinshaw's brother had once found a dead person.

5.5.8    In addition to the blinds, the window, and the blanket shoved back into Frasier's apartment, Detective Stefan noted a further discrepancy related to clothing found on Frasier's back patio. "When HINSHAW was questioned about the clothes which were found by police on the decedent's patio, he said the clothes found outside could have been wrapped in the blanket which he took from FRASIER'S apartment early Sunday morning. It should be noted, Officer Skarpho told [Detective Stefan] and Detective Sundby at the time that he <u>first</u> went to the rear of FRASIER's apartment, with HINSHAW, there was <u>no</u> clothing lying on the concrete patio at the rear of FRASIER's apartment." (emphasis in the original).

\\\\\

\\\\\

COMPLAINT - 24

5.5.9   In response to multiple questions from Detective Stefan to try to confirm Hinshaw's chronology of events, Hinshaw admits "the initial plan was to have sex." Hinshaw said he "rubbed" Frasier's breasts.  When asked about having sex with Frasier, and Hinshaw's earlier statements that he would have used a condom, Hinshaw explained that he "was going to go back to my apartment and get a condom – I guess."

5.5.10  Hinshaw told Detective Stefan Frasier did not want to have sex on July 17, 1994, and that Hinshaw accepted Frasier's decision.

5.5.11  When detectives asked Hinshaw what his response would be if the medical examiner narrowed Frasier's time of death between 0200 hours and 02300 hours Sunday morning, Hinshaw responded by saying: "Then I'm fucked – aren't I."

5.5.12  When officers took Hinshaw back to his apartment after the July 18, 1994 police interview, Hinshaw spontaneously commented that detectives could not help him anyway.

5.6   **"Detectives responded to the scene and began processing the area for evidence. Detectives noted that Audrey Frasier was lying on her back, completely naked, on a water bed located within the living room of the apartment. The victim showed visible signs of recent sexual contact (intercourse) as what appeared to be semen was located around her vaginal area along with vaginal bleeding."**

Deliberately False Statements or Omissions; or Reckless Disregard of the Truth:

5.6.1   Dr. Archie Hamilton, former Clark County, WA Medical Examiner, conducted an autopsy of Frasier at approximately 3:15 p.m. on July 18, 1994.

5.6.2   Dr. Hamilton made no note of semen found outside of Frasier's body: "The external genitalia are those of an adult female.  There is trace of blood extending from

COMPLAINT - 25

the vaginal vault over the inner cheeks.  There is no trauma to the vulva or adjacent structures."  Later in his report, Dr. Hamilton states "[t]here are no injuries to the labia major, labia minora or other soft tissue of the vulva.  The vaginal vault is examined with a speculum, revealing a small amount of thick, whitish/yellow, mucoid material which is blood-stained.  There are no lacerations, contusions or abrasions of the vaginal vault.  The cervix uteri is hemorrhagic and contains a minute amount of bright red blood within the endocervical canal."

       5.6.3    Detective Stephan made no note of semen when he examined Frasier's body at the crime scene.  "The external opening of the victim's vagina seemed to be moist, upon visual inspection, giving R/O suspicion that the victim may have had intercourse recently, due to the possible excretions present."

       5.7    **"Detectives also noted that the victim had several contusions on the anterior portion of her neck and had what appeared to be petechial about her eyes along with a bruise on her left lower thigh. During the investigation, detectives collected a variety of DNA evidence including but not limited to; vaginal and anal swabs, fingernail scrapings, saliva samples and dried secretions."**

       5.7.1    Dr. Hamilton also noticed a puncture wound on Frasier's right mid tibia.

\\\\\

\\\\\

\\\\\

\\\\\

\\\\\

COMPLAINT - 26

Charles A. Isely, Attorney at Law, P.C.
205 E 11th St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200

1

5.8    **"An autopsy was performed on the victim on July 18th, 1994 by Dr.**

2   **Archie Hamilton who concluded that cause of death was strangulation and that the**

3   **manner of death was homicide. Dr. Archie Hamilton noted 'multiple contusions of the**

4   **skin, soft tissue of the neck and thyroid gland' and an 'acute fracture of the tip of the**

5   **greater horn of the hyoid bone' consistent with a strangulation. An intrapelvic**

6   **hemorrhage was also noted that involved the uterus, fallopian tubes, uterosacral**

7   **ligaments and pervesical soft tissue which was consistent with a sexual assault."**

8

Deliberately False Statements or Omissions; or Reckless Disregard of the Truth:

9

10        5.8.1    Dr. Hamilton does not use the words "sexual assault" in his autopsy

11   report; nor does Dr. Hamilton make any finding of a sexual assault.

12        5.9    **"Dr. Archie Hamilton concluded that all of the noted injuries 'appear to**

13   **have occurred in the same time frame and are acute'."**

14        Deliberately False Statements or Omissions; or Reckless Disregard of the Truth:

15        5.9.1    Dr. Hamilton notes the "injuries" to Frasier appear to have occurred in

16   the same "time frame and are acute."  However, Dr. Hamilton does not define what he

17   means by "time frame."

18

19        5.9.2    Dr. Hamilton mentions only "injuries" as appearing to have occurred

20   in the same "time frame."  He does not find, nor mention, that any DNA found on or inside

21   Frasier's body occurred within this same "time frame."  DNA from semen, for example, may

22   be detected inside the vaginal vault for several days after intercourse.

23        5.9.3    Furthermore, an "acute" injury refers to an injury that has not begun

24   the healing process.  Dr. Hamilton identified a fracture at the tip of the greater horn on

25   Frasier's hyoid bone.  This fracture will cause death within minutes or even seconds.  The

COMPLAINT - 27

Charles A. Isely, Attorney at Law, P.C.
205 E 11th St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200

1   injuries noted on Frasier's pelvis, however, could have occurred days before the hyoid bone

2   fracture.

3           5.9.4   Defendant was aware that Frasier struggled with drug and alcohol

4   abuse, and that it was not uncommon for Frasier to engage in causal sexual encounters.

5       5.10   **"During the course of the initial investigation, several suspects were**

6   **developed but were eliminated as being the source of the DNA evidence (semen and**

7   **fingernail scrapings from the victim).  The DNA located in the semen and fingernail**

8   **scrapings matched and were thereby listed as unknown person; 'Individual A'. Over**

9   **the course of several years, numerous persons of interest were developed and tested**

10  **against 'Individual A' with negative results as well as the sample being uploaded into**

11  **the Combined DNA Index System (CODIS) with negative net results."**

12

13          Deliberately False Statements or Omissions; or Reckless Disregard of the Truth:

14          5.10.1  Defendant fails to mention the Hinshaw's DNA (i.e., seminal fluid)

15  was found on Frasier's comforter which was located underneath Frasier's body.

16      5.11   **"In 2018, with advances in DNA testing technology and open source DNA**

17  **genealogy catalogues, a sample of 'Individual A' was sent to Parabon NanoLabs, a**

18  **company based in Restron, Virginia that provides DNA phenotyping services**

19  **(composite sketches based on DNA) for law enforcement.  The sample of 'Individual A'**

20  **was also uploaded and compared by Parabon NanoLabs to GED match which is an**

21  **open data personal genomics database and genealogy website.  Parabon NanoLabs was**

22  **then able to determine that 'Individual A' shared similar DNA characteristics with a**

23  **known person with a second cousin relationship.  By working a genealogical analysis**

24  **from this known person, Parabon NanoLabs was able to locate a person of interest**

25

COMPLAINT - 28

1   **named Richard Eugene Knapp (04/05/1965) who was known to live in Vancouver,**

2   **Washington area during the time of the criminal act."**

3       5.11.1  Plaintiff admits Defendant and other members of the Vancouver

4   Police Department identified Plaintiff through the use of genealogical research and DNA.

5       5.12   **"Richard Knapp was convicted of sexual assault in the State of**

6   **Washington in 1986 but his DNA was not uploaded to any database."**

7       <u>Deliberately False Statements or Omissions; or Reckless Disregard of the Truth</u>:

8       5.12.1  Unlike the Declaration, Defendant correctly states Plaintiff was

9   convicted of sexual assault in 1986 instead of pleading guilty.

10      5.12.2  Defendant excised any reference to strangulation of the victim of the

11  1986 assault in the Affidavit, contrary to Defendant's statements in the Declaration.

12  Defendant prepared the Affidavit after a custodial, post-arrest interrogation of Plaintiff on

13  April 28, 2019.  During that interrogation, Plaintiff denied ever strangling any previous

14  sexual partners.  Plaintiff also informed Defendant, and his partner, Detective Martin, that

15  strangulation never was brought up during his 1986 trial.

16      5.12.3  Defendant fails to mention, as he did in his Declaration, that Plaintiff

17  provided a court-ordered biological sample that was never uploaded into any database and

18  that was destroyed in 2000.

19  \\\\\

20  \\\\\

21  \\\\\

22  \\\\\

23  \\\\\

24

25

COMPLAINT - 29

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5.13   **"Covert surveillance was conducted on both the home and place of work of Richard Knapp in order to obtain a discarded item that might contain DNA evidence for comparison. A cigarette butt, placed into a receptacle outside Richard Knapp's place of employment, was seized and subsequently analyzed by the WSP Crime Laboratory. The DNA located in the cigarette butt matched that of unknown person 'Individual A', indicating that Richard Knapp was the source DNA at the original homicide crime scene (semen and skin cells underneath the victim's nails)."**

Deliberately False Statements or Omissions; or Reckless Disregard of the Truth:

5.13.1  In a report from the Washington State Patrol's Crime Laboratory, dated August 24, 2017, Plaintiff's DNA was found in Frasier's vaginal vault and underneath her fingernails, and Plaintiff's DNA was found in one stain on Frasier's comforter.

5.13.2  Defendant fails to mention the August 24, 2017 report also identifies Hinshaw's DNA (i.e., seminal fluid) on a separate stain on the same comforter.

5.14   **"Richard Knapp was contacted on April 28th, 2019 at his residence in Oregon and gave a voluntary statement.  During this interview, Richard Knapp denied knowing the victim or having any sexual contact with her.  Richard Knapp was subsequently booked into Multnomah County Jail (Oregon) on a fugitive warrant and was transported to Clark County Jail (Washington) on April 30, 2019 for formal charging."**

Deliberately False Statements or Omissions; or Reckless Disregard of the Truth:

5.14.1  Defendant fails to mention that Plaintiff struggled to recall people and places, dating back twenty-five (25) years; or that Plaintiff admitted to partying in his

COMPLAINT - 30

Charles A. Isely, Attorney at Law, P.C.
205 E 11th St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200

younger years and that he slept with multiple women during this time period who he could not recall.

15.14.2  Defendant's reference to a "fugitive warrant" leaves the Court with the incorrect impression Plaintiff was already wanted on some other offense because Judge Clark did not authorize Plaintiff's arrest warrant until April 29th.  Although Plaintiff was arrested in Oregon, Plaintiff never saw an Oregon judge nor did Plaintiff go through any extradition process before Plaintiff was transported to Clark County, Washington.

## VI.   CLAIM FOR JUDICIAL DECEPTION
### RE: Declaration for Probable Cause
### (Civil Rights Claim under 42 U.S.C. § 1983)

6.1      Plaintiff reincorporates by reference all prior allegations from Articles I through IV of this Complaint into this section.

6.2      The Fourth Amendment, as made applicable in this case through the Fourteenth Amendment, protects a person's rights "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.

6.3      Plaintiff could only have been arrested and detained for Frasier's murder based upon the Court's determination of probable cause.

6.4      Judge Clark determined probable cause existed for Plaintiff's arrest and detention, based upon the Defendant's Declaration.

6.5      Plaintiff specifically alleges Defendant completed the Declaration, and that the Declaration was submitted to Judge Clark on April 29, 2019, while Defendant acted under color of state law as a Detective for the Vancouver Police Department.

6.6      Defendant's deliberately false statements and omissions, or Defendant's reckless disregard of the truth, cited in Article IV of this Complaint support a claim for

Charles A. Isely, Attorney at Law, P.C.
205 E 11th St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200

judicial deception against Defendant under 42 U.S.C. § 1983 for Defendant's violation of Plaintiff's Fourth Amendment rights (as guaranteed by the Fourteenth Amendment) while Defendant acted under color of state law.

6.7    The allegations in Article IV of this Complaint evidence Defendant included deliberately false statements or omissions in his Declaration; or that Defendant submitted his Declaration in reckless disregard for the truth.

6.8    Defendant's deliberately false statements or omissions, or Defendant's reckless disregard for the truth, were material to Judge Clark's finding of probable cause.

6.9    If the Declaration did not include the deliberately false statements or omissions, or if the Declaration did not evidence Defendant's reckless disregard for the truth, Judge Clark would not have found probable cause to arrest and detain Plaintiff.

6.10    Plaintiff spent over three years in jail.  His wife died while he awaited trial. His efforts to be with her before she died were denied in a two sentence order.  Plaintiff has suffered severe emotional distress.  His career and relationships with friends and family were destroyed.  He lost his home.  He remains a pariah in the community, as the cloud of Frasier's murder follows him wherever he goes.

6.11    Defendant participated in a custodial interrogation of Plaintiff on April 28, 2019.  Plaintiff emphatically denied killing Frasier; he denied "strangling" women during sex; he admitted to having multiple relationships with women during his younger years and that he drank and did drugs.  When asked whether he drank and did drugs to the point where he blacked out or did not remember things, Plaintiff said "I'd remember if I killed someone!"

COMPLAINT - 32

## VII.   CLAIM FOR JUDICIAL DECEPTION
### RE: Affidavit in Support of Search Warrant
### (Civil Rights Claim under 42 U.S.C. § 1983)

7.1     Plaintiff reincorporates by reference all prior allegations from Articles I through V of this Complaint into this section.

7.2     The Fourth Amendment, as made applicable in this case through the Fourteenth Amendment, protects a person's rights "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.

7.3     Defendant could have only obtained a biological sample for DNA or biological testing from Plaintiff based upon the Court's determination of probable cause.

7.4     Judge Sleight determined probable cause existed to obtain a search warrant, authorizing the collection of a biological sample from Plaintiff for DNA or biological testing, based upon the Defendant's Affidavit.

7.5     Plaintiff specifically alleges Defendant completed the Affidavit, and that the Affidavit was submitted to Judge Sleight on April 30, 2019, while Defendant acted under color of state law as a Detective for the Vancouver Police Department.

7.6     Defendant's deliberately false statements and omissions, or Defendant's reckless disregard of the truth, cited in Article V of this Complaint support a claim for judicial deception against Defendant under 42 U.S.C. § 1983 for Defendant's violation of Plaintiff's Fourth Amendment rights (as guaranteed by the Fourteenth Amendment) while Defendant acted under color of state law.

7.7     The allegations in Article V of this Complaint evidence Defendant included deliberately false statements or omissions in his Affidavit; or that Defendant submitted his Affidavit in reckless disregard for the truth.

COMPLAINT - 33

Charles A. Isely, Attorney at Law, P.C.
205 E 11ᵗʰ St., Suite 102
PO Box 61983
Vancouver, WA  98666-1983
(360) 993-1200

7.8     Defendant's deliberately false statements or omissions, or Defendant's reckless disregard for the truth, were material to Judge Sleight's finding of probable cause.

7.9     If the Declaration did not include the deliberately false statements or omissions, or if the Affidavit did not evidence Defendant's reckless disregard for the truth, Judge Sleight would not have found probable cause to arrest and detain Plaintiff.

7.10    Defendant subjected Plaintiff to an invasive and humiliating search.  Plaintiff spent over three years in jail.  His wife died while he awaited trial.  His efforts to be with her before she died were denied in a two-sentence order.  Plaintiff has suffered severe emotional distress.  His career and relationships with friends and family were destroyed.  He lost his home.  He remains a pariah in the community, as the cloud of Frasier's murder follows him wherever he goes.

7.11    Defendant participated in a custodial interrogation of Plaintiff on April 28, 2019.  Plaintiff emphatically denied killing Frasier; he denied "strangling" women during sex; he admitted to having multiple relationships with women during his younger years and that he drank and did drugs.  When asked whether he drank and did drugs to the point where he blacked out or did not remember things, Plaintiff said "I'd remember if I killed someone!"

## VIII.   REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests relief as follows:

8.1     Compensatory damages;

8.2     Punitive damages from Defendant on Plaintiff's claim under 42 U.S.C. § 1983;

COMPLAINT - 34

1        8.3      Costs, including reasonable attorney fees, under 42 U.S.C. § 1988 and to the

2 extent otherwise permitted by law;

3        8.4      The right to conform the pleadings to the evidence presented at trial;

4        8.5      Such other relief as may be just and equitable.

5        Dated this 12th day of February 2024 by:

6

7        s/ Charles A. Isely           s/ John L. Green
        Charles A. Isely, WSBA #34130    John L. Green, WSBA #35483

8        Attorney for Plaintiff          Attorney for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COMPLAINT - 35