1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8
9
10

| | |
|---|---|
| RICHARD E. KNAPP, | CASE NO. 3:24-cv-05118-DGE |
| Plaintiff, | ORDER GRANTING SUMMARY JUDGMENT (DKT. NO. 35) AND DENYING AS MOOT MOTION TO EXCLUDE (DKT. NO. 41) |
| v. | |
| DUSTIN GOUDSCHAAL, | |
| Defendant. | |

11
12
13
14
15
16

## I      INTRODUCTION

On July 17, 1994, Audrey A. Frasier was found dead in her apartment in Vancouver, Washington.  Her body was found lying nude on a waterbed in her apartment, with signs of recent sexual contact, including semen in and around her genitalia.  The cause of death was strangulation.  Investigators initially focused their attention on Scott Hinshaw, Frasier's neighbor who first reported finding her body, and who acknowledged being intimate with her in the past. Detectives felt that he was evasive or untruthful in his responses to their questions and had acted suspiciously over the course of the investigation.  However, forensic testing revealed that he

17
18
19
20
21
22
23
24

could not have been the donor of the semen found in the victim's vagina, and he was excluded as a suspect.  Other possible suspects were also excluded, and the case went cold.

Fast forward to 2018.  Vancouver PD hired a private company to create a genealogical profile of "Individual A"—the unidentified individual whose DNA was found in Frasier's vagina and under her fingernails.  The private lab suggested that Vancouver PD investigate Richard E. Knapp, who lived in Vancouver and who had a prior rape conviction.  Police followed Knapp, obtained a discarded cigarette butt from him, and sent it to the Washington State Police ("WSP") lab for testing.  Knapp's DNA was a match to Individual A, seemingly ending a decades-long search for the perpetrator.  Vancouver PD obtained an arrest warrant for Knapp, and subsequently a search warrant to obtain a buccal swab from him.  He was charged with Frasier's murder.  However, the Clark County Prosecutor ultimately decided to dismiss the prosecution, citing other evidence that had come to light.

This case is about the probable cause affidavit used to obtain the arrest and search warrants against Knapp.  Knapp, the Plaintiff in this civil action brought under 42 U.S.C. § 1983, claims that the affiant, Defendant Dustin Goudschaal, engaged in "judicial deception" by deliberately or recklessly making false statements or omissions in the affidavit.  In particular, Knapp argues that Goudschaal was under an obligation to include evidence inculpating Hinshaw and that he mischaracterized the physical evidence.  He seeks damages for this alleged violation.  Defendant has moved for summary judgment, arguing that Plaintiff cannot prove the elements of the claim.

The Court will GRANT the summary judgment motion, for multiple reasons.  First, Plaintiff cannot show that the allegedly false statements or omissions he complains of in the affidavit were either deliberate or demonstrate a reckless disregard for the truth.  Second, and

1  perhaps more importantly, even if the Court were to credit each of Plaintiff's contentions and re-

2  write the affidavit to include them, there would still have been probable cause to issue the search

3  and arrest warrants.  Plaintiff does not and cannot dispute that his DNA was found inside the

4  victim's vagina and under her fingernails, and that indisputably provided probable cause—a

5  relatively low burden—for the search and arrest, even if other evidence tended to inculpate

6  Hinshaw.  That the State subsequently lost faith in its ability to prove its case beyond a

7  reasonable doubt at trial (whatever the merits of that decision) does not negate the probable

8  cause determination, either.  Thus, Defendant is entitled to summary judgment, because no

9  reasonable jury could find that he committed "judicial deception" in obtaining search and arrest

10  warrants for Knapp.  The Court also briefly reviews Defendant's qualified immunity argument

11  and finds that it also supports the outcome.  Finally, the Court DENIES as moot Defendant's

12  motion to exclude Plaintiff's expert witness.

13              **II      FACTUAL BACKGROUND**[1]

14          1.  Discovery of Audrey Frasier's Body

15          Audrey Frasier lived in the Family Tree Apartments in Vancouver, Washington.  (Dkt.

16  No. 39-1 at 4).  On the evening of July 17, 1994, her next door neighbor, Scott Hinshaw, called

17  911 to report that he could see her body laying on her bed, nude, through a window, and that she

18  was not responsive to his efforts to reach her.  (*See id.*; *see also* Dkt. Nos. 39-2; Dkt. No. 39-3 at

19  4.)  Hinshaw stated that he had been with Frasier the night before, and that he left around 2:00 or

20  2:30 a.m. when some other person knocked on her door.  (Dkt. Nos. 39-2 at 4; 39-3 at 4.)

21  Officer Skarpho responded to the scene.  Skarpho tried to enter Frasier's apartment through the

22

23  [1] The following is not intended as an exhaustive review of the factual record, which is
voluminous, but rather a summary of the most pertinent information to evaluating probable
24  cause.

ORDER GRANTING SUMMARY JUDGMENT (DKT. NO. 35) AND DENYING AS MOOT MOTION TO
EXCLUDE (DKT. NO. 41) - 3

1    front door but it was locked, and Hinshaw led Skarpho through his own apartment to a back

2    patio, from which he had seen Frasier's body.  (Dkt. No. 39-3 at 4.)  Ultimately, Skarpho and

3    other first responders forced entry through the front door and quickly determined that Frasier was

4    in fact deceased.  (*Id.* at 4–5.)

5         There were some visual indications at the scene of what had occurred.  Officers noted

6    what appeared to be fresh abrasions on her neck, her lips were bluish, and there were signs of

7    postmortem lividity.  (*Id.* at 4; Dkt. No. 39-4 at 2.)  Detective Wally Stefan observed that "[t]he

8    external opening of the victim's vagina seemed to be moist, upon visual inspection, giving [the

9    responding officer] suspicion that the victim may have had sexual intercourse recently, due to the

10   possible excretions present."  (Dkt. No. 39-5 at 4.)  Skarpho's investigative report noted an odd

11   finding: when he first viewed the crime scene, the back window to Frasier's apartment was

12   closed, but "some time during the course of events, someone possible entered the rear patio area

13   and opened the window."  (Dkt. No. 39-3 at 6.)  Over the course of the investigation, detectives

14   collected vaginal and anal swabs, fingernail scrapings, and other samples.  (Dkt. No. 39-1 at 4.)

15            2.  Initial Investigation in 1994

16        The next day, July 18, 1994, Clark County Coroner Dr. Archie Hamilton performed an

17   autopsy on Frasier.  (Dkt. No. 40 at 3.)  He ruled the cause of death as strangulation and manner

18   of death as homicide.  (*Id.*)  He identified injuries resulting from strangulation including:

19   contusions to the skin, neck, and thyroid, and fracture of the hyoid bone; he also found acute

20   hyperemia and edema of the lungs; intrapelvic hemorrhage including injuries to the uterus and

21   fallopian tubes; contusion of the cervix; cerebral edema (brain swelling); and contusions of the

22   lower extremities.  (*Id.*)  Summarizing his findings, Hamilton stated: "The injury to the neck,

23   pelvis, cervix uteri and lower extremities all appear to have occurred in the same time frame and

24

1    are acute." (*Id.* at 4.) He noted "a small amount of thick, whitish/yellow, mucoid material which

2    is blood-stained" in the vaginal vault. (*Id.* at 8.)

3        Vancouver PD interviewed Hinshaw, who relayed his version of events. On the night of

4    Saturday July 16, Hinshaw came to Frasier's apartment after being out at a bar, and was drunk.

5    (Dkt. No. 39-6 at 5.) He stated that while he was there, Frasier took her clothes off, and he did

6    too, but she did not want to have sex. (*Id.* at 5–7.) He was hoping to have sex with Fraiser; he

7    touched her breasts and "kissed her on the stomach," and he may have "brushed her neck." (*Id.* at

8    7–8, 12.) He insisted that they did not have sex that night, but at one point said he could not

9    remember, and said if they did have sex he would have used a condom. (*Id.* at 7–8.) He

10   acknowledged they did have sex once before, a couple of months prior. (*Id.* at 6.) Hinshaw said

11   he left the apartment after someone knocked on the door and Frasier stated, "my pot's here."

12   (*Id.*) He immediately jumped off the bed and exited through the back door, grabbing a blanket

13   on his way out, and slept the rest of the night. (*Id.*) Hinshaw revealed that when he discovered

14   Frasier's body, his first call was to his brother, who had "experience" from previously finding a

15   dead body. (*Id.* at 9.) Hinshaw acknowledged that he was the person responsible for opening

16   Frasier's window after the police arrived, and he did so to throw the blanket back into the

17   apartment. (*See id.*) On the whole, investigators did not find Hinshaw credible and noted that he

18   "gave investigators every impression, throughout the interview, [that] he was being deceptive."

19   (Dkt. No. 39-6 at 3.) He spoke in a "slow, deliberate, fashion," gave non-committal answers,

20   and avoided making eye contact. (*Id.* at 3–4.)

21       Investigators also interviewed a man described as Frasier's boyfriend, Michael Lilly. He

22   portrayed himself as someone trying to help Frasier deal with a drug abuse problem. (Dkt. No.

23   36-10 at 6, 24.) Lilly was a performer in a rock group band. (*Id.* at 1.) He had an alibi: the

24

ORDER GRANTING SUMMARY JUDGMENT (DKT. NO. 35) AND DENYING AS MOOT MOTION TO
EXCLUDE (DKT. NO. 41) - 5

weekend of the murder, he was performing in Seattle, and staying there with friends.  (*See id.* at 4–5.)  Frasier had joined Lilly and the band up in Seattle until that Saturday morning, when they got in an argument after Lilly confronted her about her drug use, and Lilly told her to go home to Vancouver.  (*Id.* at 6–7.)  Lilly acknowledged that he grabbed Frasier's throat during the argument, something that caught investigators' attention because of the manner of her death.  (*Id.* at 12–13, 21.)  He described her as acting "absolutely crazy" and "irrational."  (*Id.* at 13–14.)  Lilly "didn't want to deal with it," so he filled up her car with gas, and she drove back to Vancouver.  (*See id.* at 14–15.)

Ultimately, forensic testing ruled out both Lilly and Hinshaw.  A 1994 WSP report determined that Lilly was not likely the contributor of the semen sample in Frasier's vagina, based on blood antigen analysis.  (Dkt. No. 37-6 at 8.)  Another 1994 WSP report likewise determined that Hinshaw was not the contributor.  (Dkt. No. 39-9 at 2.)  At this point, it appears the case went cold.

### 3. Re-Investigation, Identification of Richard Knapp as a Suspect, and Arrest

Over the following years, WSP tested DNA samples of numerous other individuals against the samples taken from the Frasier crime scene to no avail.  (*See generally*, Dkt. No. 37.)  In 2016, a WSP report determined that the same "Individual A" was a possible contributor to both the DNA from the vaginal swab and the scrapings from Frasier's fingernails; but three men tested were excluded as Individual A.  (Dkt. No. 37-4.)  In 2017, DNA testing reaffirmed that none of Hinshaw, Lilly, or several other individuals were a match to Individual A.  (Dkt. No. 37-9.)  In 2017, WSP performed testing on the comforter on which Frasier's body was found and identified multiple semen stains.  One stain, referred to as Stain C, was consistent with Hinshaw's DNA.  (Dkt. No. 37-12 at 2.)  Another stain, labeled as Stain D, was consistent with

1   Individual A's DNA, and consequently neither Hinshaw nor Lilly were contributors to that stain.

2   (*Id.*)  Stain D was located near the center of the comforter (where Frasier's body had been

3   found), while Stain C was located at the edge.  (*See* Dkt. Nos. 37 at 3; 37-14.)  The lab also

4   tested a piece of gauze used to swab Frasier's knee during the autopsy; it contained a mixture of

5   genetic material from three males (and a female), but none of Hinshaw, Lilly, or Individual A

6   were contributors.  (Dkt. Nos. 37 at 8–10, 37-3 at 3, 37-4 at 2.)  The contributor of the "major

7   component" of this material was designated as "Individual B."  (*See id.*)

8       In 2018, Vancouver PD took a new approach to identifying Individual A.  They hired an

9   outside agency, Parabon Nanolabs, to create a genetic profile of the suspect.  Parabon uploaded

10  the suspect's DNA profile to a public database, GEDmatch, which showed a fifth- or sixth-

11  degree relationship to one individual participating in the database, and an eighth- or ninth-degree

12  relationship with another.  (*See* Dkt. No. 38-1 at 3–4.)  From there, Parabon used the database to

13  trace a line of genealogy from those individuals to someone who lived in the Vancouver,

14  Washington area and plausibly could have been involved in the crime.  (*Id.* at 5–7.)  That led

15  them to Richard Knapp and his brother Clayton.  (*See id.*)  Richard was considered the likelier

16  suspect because of his prior rape and other convictions, whereas Clayton had no criminal history.

17  (*Id.* at 7.)  Parabon recommended treating Richard as a person of interest and obtaining his DNA

18  to compare to the crime scene sample.  (*Id.* at 8–9.)

19      Vancouver PD ran with the recommendation.  Detective Neil Martin identified and

20  conducted an interview with the victim of Knapp's 1986 rape, Barabara Gould (known at the

21  time as Barabara Hall).  Gould stated that in 1986, she was living in a group home in Vancouver,

22  she was 18 years old, and had a young daughter.  (*See* Dkt. No. 38-2 at 5.)  There was a party in

23  her apartment complex and Knapp and his friend were invited.  (*Id.*)  Knapp offered to escort her

24

1    back to her apartment, but on the way he claimed he forgot something in a rec room, and they

2    entered the rec room together.  (*Id.*)  He locked the door of the rec room behind her and began

3    raping her.  (*See id.* at 6.)  Gould complied with his commands out of fear that he would hurt her

4    daughter, who was present.  (*Id.*)  Of relevance here, Gould stated that he choked her during the

5    attack, to the point that she became dizzy.  (*Id.* at 12–13.)  Eventually, Gould went to the

6    hospital, where a semen sample and pubic hairs were recovered.  (*Id.* at 14.)[2]  Knapp was

7    convicted at a jury trial and sentenced to 365 days incarceration.  (Dkt. No. 39-15 at 7, 14.)

8        In January 2019, Officers conducted surveillance of Knapp, and Detective Goudschaal

9    observed him discard two cigarette butts into a can outside his place of work.  (Dkt. No. 38-4 at

10   2.)  Detectives collected the butts and sent them to the WSP lab.  (*Id.*)  Lo and behold, in

11   February 2019, the WSP lab reported that DNA was recovered from the cigarette butts, and it

12   was a match to Individual A.  (Dkt. No. 37-17.)

13       Detective Goudschaal also interviewed a number of other individuals who may have had

14   information on Knapp.  In April 2019, Detective Goudschaal spoke with Vickie Kyllo, who lived

15   at the Family Tree Apartments and whose apartment was within 200 feet of Knapp's address at

16   the time.  (Dkt. Nos. 39-16 at 2; 38-5.)  Detective Goudschaal showed Kyllo photos from

17   Frasier's funeral and did not recognize anyone, he also showed her a picture of Knapp and she

18   stated she "may have seen him around the apartments."  (Dkt. No. 39-16 at 2.)  She also

19   speculated that her estranged husband could have been the killer, but he had already been

20   excluded by DNA.  (*Id.*)  Further, Detective Goudschaal spoke with Knapp's ex-wife Cynthia

21

22
    _____
    [2] Gould acknowledged she initially said that the perpetrator was a Black man, which was a lie;
23  she claimed to have done so because she feared that if her roommate ran into Knapp outside their
    apartment, knowing he was the real perpetrator, "she would see him and freak out and stuff and
24  he'd hurt us."  (Dkt. No. 38-2 at 6.)

1    Smith, who was married to Knapp at the time of Frasier's death. (Dkt. No. 36-8 at 1.) Smith

2    alleged that Knapp was abusive and frequently used alcohol and drugs. (*Id.*) She did not know

3    Frasier, but recalled an incident that summer in which Knapp came home with a "bite or

4    laceration to his ear" and refused to tell her what happened. (*Id.*)

5        Around the same time, Detective Goudschaal began preparing the probable cause ("PC")

6    affidavit that would become the focus of this case. The PC affidavit starts by describing the

7    discovery of Audrey Frasier's body and the crime scene. (Dkt. No. 36-1 at 7.) As to other

8    possible suspects, it states: "[d]uring the course of the initial investigation, several suspects were

9    developed but were eliminated as being the source of the DNA evidence (semen and fingernail

10   scrapings from the victim)." (*Id.*) It goes on to describe how "numerous persons of interest were

11   developed and tested against 'Individual A' with negative results," though it does not name any

12   of those individuals. It mentions that "advances in forensic science" helped identify Knapp in

13   2018, without naming Parabon Nanolabs or their process specifically. (*Id.*) It then discusses

14   collection of cigarette butts from Knapp and identification of a match to Individual A by the

15   WSP lab. (*Id.* at 7–8.) Finally, it includes Kyllo's statement that she "may have seen him

16   around the apartment complex" after being shown a photo of Knapp. (*Id.* at 8.) The affidavit

17   makes no explicit reference to the comforter, or the stains found on it. (*See id.* at 7–8.)

18   Detective Goudschaal signed the affidavit on April 24, 2019. (*Id.*)

19       Shortly thereafter, on April 28, 2019, Detectives Goudschaal and Martin conducted an

20   interview with Knapp and his wife Michelle together at their home. Knapp stated he could not

21   recall having ever been at the Family Tree Apartments. (Dkt. No. 36-11 at 11.) When presented

22   with a picture of Frasier, he said he did not recognize her or her name. (*Id.* at 16.) He did

23   acknowledge going to two bars she used to frequent, including one called Omar's. (*Id.* at 16–

24

ORDER GRANTING SUMMARY JUDGMENT (DKT. NO. 35) AND DENYING AS MOOT MOTION TO
EXCLUDE (DKT. NO. 41) - 9

17.)  When asked if he had sex with Frasier, or any of several other individuals whose pictures he was shown, Knapp said "No. . . I don't recognize any of them, no."  (*Id.* at 25.)  This was in the presence of his wife, who stated "I'd kill him," in reference to any infidelity.  (*Id.* at 22.)  Immediately after the at-home interview, the situation escalated.  "Roughly five minutes" later, the detectives learned that Knapp drove off and stopped at a gas station.  (Dkt. No. 39 at 6.)  Fearing that he was about to flee, he was arrested at the gas station by Gresham, Oregon Police on a warrant in the National Crime Information Center (NCIC).  (*See id.*)

    After the arrest, Knapp was interviewed a second time and elected to speak.  When told Frasier was dead, he said "I had nothing to do with that," but as to his DNA being on the scene, he said "I mean I slept with different women, I told you that. So what?"  (Dkt. No. 36-12 at 3.)  He continued to deny recognizing Frasier.  (*Id.* at 5, 10.)  When asked if he sold marijuana, Knapp denied being a "drug lord," but acknowledged "I gave it to people. I mean there was sometimes I maybe would sell some pot or something but that was very few."  (*Id.* at 8.)  After being asked if he could "have had sex with her and just not remembered?" Knapp stated "Well I yeah it's po- it's possible" and "I had sex with a lot of women that I don't remember a lot of them, I mean that's a lot of years ago."  (*Id.* at 10–11.)  He acknowledged that "if you're saying my DNA's in her than I – obviously I must have had sex with her. Did I hurt her or did I kill her? No."  (*Id.* at 11.)  Asked how he could be sure of that if he could not remember having sex with her, Knapp stated, "[w]ould I not remember I killed somebody or hurt somebody, yeah I would remember that."  (*Id.*)  After some confusion or equivocation, he stated that he does not like to choke women during sex.  (*Id.* at 14–15.)  At the end of the interview, Detective Goudschaal advised Knapp he was under arrest for murder.  (*Id.* at 25.)

1        The next day, April 29, 2019, Clark County Superior Court Judge Suzan Clark granted

2 Detective Goudschaal's application for an arrest warrant.  (Dkt. Nos. 35 at 9; 36-1 at 8.)  The

3 Clark County Prosecutor charged Knapp with one count of Murder with a Sexual Motivation.

4 (Dkt. No. 36-1 at 5.)  On April 30th, Goudschaal submitted a search warrant application for a

5 buccal swab of Knapp, containing a substantially similar probable cause statement, which was

6 granted the same day by Judge Chad Sleight.  (Dkt. Nos. 35 at 9; 39-1 at 6.)  WSP's analysis of

7 that swab, reported in June 2019, confirmed that the DNA from Frasier's vaginal swab matched

8 that of Richard Knapp.  (Dkt. No. 37-18 at 2.)  As phrased in terms of statistical probabilities by

9 the report, "[t]he estimated probability of selecting an unrelated individual at random from the

10 U.S. population with a matching profile is 1 in 10 quadrillion ($10^{15}$)."  (*Id.*)  Likewise, the

11 fingernail scrapings were determined to be a mixture of Frasier and Knapp's DNA, with similar

12 statistical confidence.  (*Id.*)  And the Stain D on the comforter also belonged to Knapp.  (*Id.* at 3.)

13        4.  <u>Subsequent Developments</u>

14        On November 30, 2022, the State elected to drop the prosecution against Knapp, and the

15 charges were dismissed without prejudice.  (Dkt. No. 36-1 at 32–33.)  The dismissal document

16 states that "[a]t this time, the State does not believe it can present sufficient admissible evidence

17 to prove its case beyond a reasonable doubt.  During the course of trial preparation, the

18 prosecution and defense discovered new and credible evidence that was not known at the time of

19 filing."  (*Id.* at 32.)  Though the Court cannot know the full scope of considerations that led the

20 Clark County Prosecuting Attorney to dismiss the charges, Defendant's brief identifies two

21 developments.[3]  One, Dr. Martha Burt, the Clark County Medical Examiner at the time of

22

23 _____

[3] Defendant is represented by the Vancouver City Attorney, not the Clark County Prosecuting
24 Attorney—the authority that made the charging decision.

1  Knapp's arrest, testified in deposition that the gap in time between the neck and pelvis injuries,

2  described as occurring "in the same time frame" in Dr. Hamilton's report, could have been as

3  long as hours or days.[4]  (Dkt. No. 35 at 10; *see also* Dkt. Nos. 36-3 at 99; 36-13 at 3 (Dr. Burt

4  stating, "it was very general terms what [Dr. Hamilton] described . . . the injuries [could have

5  occurred] within minutes, seconds, minutes [sic], hours, and potentially days. . .it's a very broad

6  time spectrum.").)  Second, Hinshaw disclosed in October 2022 that he did have sex with Frasier

7  the night of the murder, while wearing a condom—contrary to his statements in 1994.  (*See* Dkt.

8  Nos. 35 at 10; 36-3 at 117.)  Both of these revelations came after the PC affidavit had been

9  drafted and submitted.

10      While charges were pending Plaintiff was incarcerated for three years, and his wife died

11  during that time.  (Dkt. No. 27 at 34.)

12              **III      SUMMARY JUDGMENT STANDARD**

13      Summary judgment is proper only if the pleadings, the discovery and disclosure materials

14  on file, and any affidavits show that there is no genuine issue as to any material fact and that the

15  movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c). The moving party is

16  entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

17  showing on an essential element of a claim in the case on which the nonmoving party has the

18  burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

19  of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

20  for the non moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

21  (1986) (nonmoving party must present specific, significant probative evidence, not simply "some

22  metaphysical doubt.").  *See also* Fed.R.Civ.P. 56(e).  Conversely, a genuine dispute over a

23

24  _____

[4] Dr. Hamilton was no longer alive by the time of Knapp's arrest.  (*See* Dkt. No. 35 at 4.)

ORDER GRANTING SUMMARY JUDGMENT (DKT. NO. 35) AND DENYING AS MOOT MOTION TO
EXCLUDE (DKT. NO. 41) - 12

1    material fact exists if there is sufficient evidence supporting the claimed factual dispute,

2    requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty*

3    *Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors*

4    *Association*, 809 F.2d 626, 630 (9th Cir. 1987).

5           The determination of the existence of a material fact is often a close question.  The court

6    must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

7    e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, T.W. *Elect.*

8    *Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor

9    of the nonmoving party only when the facts specifically attested by that party contradict facts

10   specifically attested by the moving party.  The nonmoving party may not merely state that it will

11   discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

12   to support the claim.  *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

13   Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not

14   be "presumed."  *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

15                              **IV       DISCUSSION**

16          A.  <u>Nature of the Allegations and Parties' Arguments</u>

17          Plaintiff's amended complaint includes three counts: two counts of Judicial Deception,

18   one each for the arrest warrant and search warrant, and one count of False Arrest.  (Dkt. No. 27

19   at 30–34.)  Because the PC affidavit was substantially similar for both warrants, and the Fourth

20   Amendment count is premised on a lack of probable cause (*see id.*), the analysis for the three

21   counts largely collapses into one.

22

23

24

Plaintiff's amended complaint alleges that a number of statements or omissions in the PC affidavit were deliberate or showed a reckless disregard for the truth, which the Court summarizes here:

1. The affidavit does not state that Hinshaw was drunk with Frasier the night before and admitted to touching her in an intimate manner;

2. It does not state that Hinshaw's semen was found on the comforter;

3. It does not state that Hinshaw was a suspect and was acting in a suspicious manner;

4. It does not mention the window-opening/blanket-shoving incident;

5. It does not mention inconsistencies in Hinshaw's statements regarding clothes at the crime scene;

6. It does not describe Hinshaw's incriminating statements to police in his interview, including a statement that if Frasier's death occurred between 0200 and 0230 hours, "Then I'm fucked – aren't I";

7. The PC affidavit says there were "visible" signs of recent sexual contact, when neither Dr. Hamilton's autopsy report nor investigative reports from the scene state that semen was visible outside Frasier's body;

8. The PC affidavit says Frasier's injuries were consistent with "sexual assault," but Dr. Hamilton's report does not use the words "sexual assault";

9. The PC affidavit quotes Dr. Hamilton's assessment that all of the injuries appeared to occur "in the same time frame," but that phrase is not defined;

10. The affidavit does not mention Frasier's drug or alcohol addiction and "that it was not uncommon for Frasier to engage in causal sexual encounters";

11. The PC affidavit erroneously states that Knapp pled guilty to rape in 1986, when in fact he was convicted at trial;

12. The affidavit states that the victim in the 1986 case was contacted and claimed that "Richard Knapp had strangled her to the point of near unconsciousness," but she did not use the word strangle or strangulation;

13. The PC affidavit relays portions of the interview with Kyllo without mentioning that Kyllo was arrested for burglarizing Frasier's apartment after the murder, nor that Kyllo suggested her own husband could have been the killer, and Kyllo's identification of Knapp was flawed because the photo array she was shown was suggestive (only Knapp was portrayed in a booking photo, others were shown attending Frasier's funeral);

14. The second PC affidavit, for the buccal swab, discusses Knapp's arrest and refers to a "fugitive warrant," which Plaintiff argues is misleading.

(*See* Dkt. No. 27 at 5–18.)

In his motion for summary judgment, Defendant argues that none of these contentions have legal relevance. Defendant contends that the only statement Plaintiff is entitled to have purged from the PC affidavit is the statement that he pled guilty to rape, which was an inadvertent error, but the fact of his conviction at trial for the same offense would not be purged, so the difference is immaterial. (Dkt. No. 35 at 14, 19.) Defendant argues that the characterization of Gould's testimony as alleging strangulation was a reasonable inference because her description of Knapp's actions is consistent with the definition of strangulation in Washington law. (*Id.* at 13.) Further, the affidavit did not claim that Dr. Hamilton made a

1   "finding" of "sexual assault," and the description of Frasier's injuries as being consistent with

2   sexual assault is not a deliberate or reckless misstatement.  (*Id.* at 12–13.)

3          As to information concerning Hinshaw, Defendant argues that the PC affidavit's

4   statement that other suspects were developed in 1994 but excluded by DNA evidence was

5   accurate and sufficient.  (Dkt. No. 35 at 15–16.)  Further, by arguing that additional information

6   implicating Hinshaw should have been added, Plaintiff is opening the door to consider other

7   evidence implicating himself not mentioned in the affidavit.  (*Id.* at 16, citing *United States v.*

8   *Wulferdinger*, 782 F.2d 1473, 1477 (9th Cir. 1986)).  Specifically, if the affidavit were changed

9   to state that Hinshaw's semen was found on the comforter, it should specify that Hinshaw's stain

10  was at the edge while a stain from Knapp was also found, directly underneath Frasier's pelvis.

11  (*See id.*)  Taking the evidence as a whole, probable cause to arrest Knapp for Frasier's murder

12  clearly existed.  (*See id.* at 19–20.)

13         With respect to the second affidavit and its reference to a "fugitive warrant," Defendant

14  says that what matters is that Judge Clark did grant the State's motion for an arrest warrant.  (*Id.*

15  at 22.)  A felony warrant issued in Washington and entered into NCIC allowed Knapp to be

16  arrested in Oregon and then transported to Washington.  (*Id.*)  Even if "fugitive" was misleading,

17  Defendant contends, it did not destroy probable cause as to the search warrant.  (*Id.*)

18         Defendant makes two alternative arguments that he is immune from liability.  First, he

19  argues that even if there was any fault on his part, the Clark County Prosecutor's "decision to

20  pursue criminal charges for three years severed any causal link to Goudschaal."  (*Id.* at 23)

21  (emphasis omitted).  Defendant relies on *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th

22  Cir. 2004), and argues that because he did not exert any improper influence on the prosecutor to

23  pursue the charges, there is no basis for liability against him.  (*Id.* at 23–24.)  Second, Defendant

24

ORDER GRANTING SUMMARY JUDGMENT (DKT. NO. 35) AND DENYING AS MOOT MOTION TO
EXCLUDE (DKT. NO. 41) - 16

1    argues he is entitled to qualified immunity.  Not only was there probable cause, but it was not a

2    close question—since this is not a case where a reasonable officer could question the existence

3    of probable cause, and indeed did not do so when Defendant's supervisors approved his draft

4    affidavit, Defendant is entitled to immunity.  (*Id.* at 26–27.)

5            Plaintiff's response to the motion focuses on the information Defendant knew or that was

6    available to him implicating Hinshaw.  That includes a PowerPoint slideshow Defendant

7    prepared in February 2019 that reviewed the evidence against Hinshaw.  (Dkt. No. 46 at 4; Dkt.

8    No. 48-2 at 4–24.)[5]  Plaintiff asserts Defendant did know at the time he filed the affidavit that

9    Hinshaw's DNA was on the comforter, contrary to Defendant's statements in deposition.  (Dkt.

10   No. 46 at 5–6, 11.)  Further, Defendant was aware that the autopsy report did not establish that

11   rape had occurred.  (*Id.* at 14.)  Plaintiff's response highlights that "Individual B," the major

12   contributor of male DNA on the gauze sample, remains unidentified.  (*Id.* at 10–11.)  Plaintiff

13   alleges that Defendant failed to inform his supervisor of the "blanket debacle" involving

14   Hinshaw.  (*Id.* at 14–15.)  Further, Defendant's statement that it was "noted" in Hamilton's

15   autopsy that Frasier's injuries were "consistent with sexual assault" was misleading because the

16   autopsy did not conclude that assault occurred.  (*Id.* at 18.)  Plaintiff highlights the testimony of

17   Defendant's expert, Dr. Brigitte D. Fink, who concluded that Frasier's vaginal bleeding was

18   consistent with a cyst.  (*Id.*)  Likewise, Plaintiff argues, Fink's testimony is consistent with

19   Hinshaw having sex with Frasier after she had sex with Knapp.  (*Id.* at 19.)  Plaintiff contends

20   that he was never in Frasier's apartment and that they had sex in his van in the parking lot of

21

22   _____

     [5] While Plaintiff makes much of the fact that this PowerPoint was apparently not turned over to

23   the prosecutor, James Smith, the PowerPoint is not itself evidence.  (*See* Dkt. Nos. 46 at 12–13;
     48-2.)  Smith testified that while he had not seen the PowerPoint, "I have seen some of the

24   contents in it, the photographs or some of the other material."  (Dkt. No. 48-4 at 39.)

1   Omar's bar. (*Id.* at 19, 21.) He states that it is not surprising that he would not recognize Frasier

2   after 25 years, and explains his DNA being on her as indicative of the fact that they both

3   frequented the same bars and "both engaged in casual sexual encounters." (*Id.* at 21.) Finally,

4   he argues that the prosecutor's decision to press charges is not a superseding event because

5   Defendant withheld evidence from the prosecutor too. (*Id.*)

6        B.   Analysis

7        The Parties generally agree on the applicable legal standard. For Plaintiff to survive

8   summary judgment on his claim that his Fourth Amendment rights were violated via judicial

9   deception, he "must 1) make a substantial showing of [the officers'] deliberate falsehood or

10  reckless disregard for the truth and 2) establish that, but for the dishonesty, the [searches and

11  arrest] would not have occurred." *Chism v. Washington State*, 661 F.3d 380, 386 (9th Cir. 2011)

12  (quoting *Liston v. Cnty. of Riverside,* 120 F.3d 965, 973 (9th Cir. 1997)). As to the first element,

13  Plaintiff must make the "substantial showing" to put the issue to a trier of fact, but that is less

14  than "clear proof." *Id.* at 387. The second element requires Plaintiff to establish that "the false

15  statements and omissions were material to the magistrate judge's probable cause determination."

16  *Id.* at 388–389. The standard for judicial deception overlaps with the standard for "deliberate or

17  reckless omission" for suppression under *Franks v. Delaware,* 438 U.S. 154 (1978). *Id.* at 392;

18  *see also Hervey v. Estes*, 65 F.3d 784, 789 (9th Cir. 1995), *as amended on denial of reh'g* (Dec.

19  5, 1995) ("The showing necessary to get to a jury in a section 1983 action is the same as the

20  showing necessary to get an evidentiary hearing under *Franks.*"). The Court finds that Plaintiff

21  has failed to make a showing on either element of judicial deception.

22        1.   Plaintiff Has Not Made a Substantial Showing of Deliberate Falsehood

23             or Reckless Disregard for the Truth

24

1    As to the first element, Plaintiff has not made a substantial showing.  There is one clear

2  error in the PC affidavit which Defendant acknowledges, which is that Plaintiff's 1986 rape

3  conviction was obtained via jury trial rather than guilty plea.  (*See* Dkt. Nos. 35 at 12–14; 39-15

4  at 14.)  Plaintiff at one point intended to enter a guilty plea, but changed his mind and withdrew

5  the plea.  (Dkt. No. 39-15 at 20.)  This error in the affidavit appears to have been at most

6  negligent rather than deliberate or reckless, but the Court agrees with Defendant that either way,

7  removing the erroneous reference to a plea would make no difference to the probable cause

8  determination; the fact of the conviction remains.  (*See* Dkt. No. 35 at 14.)

9    Among the omissions of which Plaintiff complains, in the Court's view, the most

10  significant is omission of the detail that Hinshaw's DNA was found on Frasier's comforter.

11  (Dkt. No. 37-12 at 2.)  That information should have been available to Defendant at the time he

12  wrote the PC affidavit, since WSP had reported this finding in 2017.  (*See id.*)  However,

13  Defendant Goudschaal testified in deposition that he was not aware of the WSP report

14  concerning the gauze pad and "Individual B," nor Hinshaw's stain on the comforter, until 2021.

15  (Dkt. No. 48-1 at 57.)  He acknowledged that he reviewed some but not all of Detective Stefan's

16  reports before preparing the affidavit.  (*Id.* at 13–14.)  Defendant's failure to review the entire

17  forensic record before writing the affidavit was arguably negligent, but the record does not

18  support an inference that omission of the comforter testing from the affidavit rendered it

19  deliberately false or showed a reckless disregard for the truth.[6]  The fact that Hinshaw's semen

20  was found on Frasier's comforter is consistent with his disclosure that he and Frasier did have

21

22  [6] Plaintiff's response cites a statement by Detective Neil Martin that he was aware of Hinshaw's
stain prior to Knapp's arrest as circumstantial evidence of Goudschaal's knowledge (Dkt. No. 46
23  at 5–6, 11.)  But Martin is not a defendant, and Martin testified that he did not recall sharing the
information with Goudschaal.  (Dkt. No. 48-5 at 5.)  Martin added that it is best practice to
24  review the entire record.  (*See id.*)

ORDER GRANTING SUMMARY JUDGMENT (DKT. NO. 35) AND DENYING AS MOOT MOTION TO
EXCLUDE (DKT. NO. 41) - 19

1   sex (and Hinshaw was consistent on that point, even as he was inconsistent on the timeframe or

2   frequency of their sexual encounters), and does not negate the fact that Knapp's DNA was found

3   in Frasier's vagina.  As Defendant notes, his PC affidavit does not mention that Plaintiff's DNA

4   was found on the comforter either, nor that Plaintiff's stain was under Frasier's pelvis.  (*See* Dkt.

5   No. 36-1.)  It would be incongruous and illogical to hold that Defendant was under an obligation

6   to disclose that forensic testing of the comforter tied Hinshaw to the scene without also

7   disclosing that the report implicated Plaintiff equally, if not more so.  And if the information

8   were added to the affidavit that both Hinshaw and Knapp's semen was on the comforter, there

9   would still have been probable cause to arrest Knapp, *see infra*.  Reviewing the evidence as a

10  whole, omission of this detail did not demonstrate reckless disregard for the truth.

11          Likewise, Defendant's characterization of Dr. Hamilton's autopsy report does not rise to

12  the level of deliberately false statement or reckless disregard for the truth.  The statement at issue

13  in the affidavit is that "[a]n intrapelvic hemorrhage was also noted that involved the uterus,

14  fallopian tubes, uterosacral ligaments and pervesical soft tissue which was consistent with sexual

15  assault."  (Dkt. No. 36-1 at 7.)  Plaintiff argues that Defendant should have consulted an expert

16  to help him interpret the autopsy findings, while Defendant argues that failure to do so would be

17  "nothing more than 'an officer's erroneous assumptions about the evidence he has received,'

18  which is insufficient as a matter of law to sustain a *Franks* claim."  (Dkt. No. 50 at 4) (quoting

19  *Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009)).  Plaintiff is correct that Dr.

20  Hamilton's report does not use the phrase "sexual assault" (*see* Dkt. No. 40 at 3–11), and the

21  sentence in the affidavit could be read as implying otherwise.  However, Defendant's inference

22  from the evidence is not an unreasonable one.  As Defendant notes, Dr. Burt testified that these

23  injuries could be consistent with either sexual assault or consensual sex (Dkt. Nos. 50 at 4; 36-3

24

at 101), so the statement in the affidavit that the injuries were "consistent with sexual assault" is accurate but possibly misleading. Even so, the statement does not rise to the level of "reckless disregard for the truth." Rewriting this aspect of the PC affidavit to state that the injuries could have been consistent either with assault or consensual sex and that the autopsy did not make a finding either way would have given the magistrate greater context, but would not have been outcome-determinative for finding probable cause.

Plaintiff's other objections to the PC affidavit fare no better. It was not a reckless disregard for the truth for Defendant to characterize Barbara Gould's statement as alleging that Plaintiff "strangled her to the point of near unconsciousness." (Dkt. No. 36-1 at 7.) Even if that is a slight overstatement, it is consistent with Gould's testimony that Plaintiff put his hand on her neck and restricted her airway to the point that she became dizzy. (Dkt. No. 38-2 at 13.) Broadly, Plaintiff takes issue with the failure to identify Hinshaw as a suspect in the affidavit. The statement in the affidavit that "[d]uring the course of the initial investigation, several suspects were developed but were eliminated as being the source of the DNA evidence (semen and fingernail scrapings from the victim)" is undeniably accurate, and the fact that Hinshaw acted suspiciously, tampered with the scene, or gave inconsistent or implausible statements does not negate the accuracy of that statement nor the probable cause to arrest Plaintiff.[7]  Plaintiff cites no authority requiring Defendant to have listed every piece of evidence implicating Hinshaw in the affidavit.

In sum, while Plaintiff is critical of the PC affidavit, none of the statements or omissions he asserts rise to the level of deliberate falsehood or reckless disregard for the truth.

---

[7] Other issues raised by Plaintiff appear irrelevant. For instance, Plaintiff argues that stains on the comforter could have been a mix of semen and other fluids such as urine. (Dkt. 46 at 19.) Plaintiff fails to explain what significance that fact would have.

1          2.  <u>There Was Probable Cause for the Search and Arrest</u>

2          Plaintiff's case must fail because even if the probable cause affidavit were re-written to

3    include each of the omissions he complains of, or to recast each of the statements he argues are

4    misleading, there would still have been probable cause to arrest and search him.  "Probable cause

5    'is not a high bar.'"  *D.C. v. Wesby*, 583 U.S. 48, 57 (2018).  It "requires only a probability or

6    substantial chance of criminal activity, not an actual showing of such activity."  *Id.* (quoting

7    *Illinois v. Gates,* 462 U.S. 213, 233-234, n.13 (1983)).  It is a "totality of the circumstances" test,

8    from the perspective of a "reasonably objective police officer."  *Id.* (quoting *Maryland v.*

9    *Pringle,* 540 U.S. 366, 371 (2003)).  This standard was satisfied here, under any formulation of

10   the probable cause affidavit.

11         Recall the key facts of this case, which are not in dispute.  Audrey Frasier was murdered

12   in Vancouver, Washington, and the manner of death was strangulation.  Her body was

13   discovered nude, with evidence of recent sexual activity; namely semen in her vagina.  She had

14   injuries in and around her neck, consistent with strangulation, and injuries in and around her

15   reproductive organs.  Richard Knapp's DNA was a match to the semen in her vagina and to

16   scrapings from under her fingernails.  He lived in Vancouver and had a prior criminal history

17   including a conviction for rape.  He frequented the same local establishments as Frasier and

18   would have had opportunity to interact with her.  The evidence is more than enough to create a

19   "probability or substantial chance of criminal activity" and establish probable cause to arrest and

20   search Knapp.

21         That remains true even when one takes into account the evidence that Frasier also had sex

22   with Hinshaw and that Hinshaw was evasive and suspicious in response to investigation of the

23   murder.  Hinshaw's post-facto admission that he did have sex with Frasier the night of the

24

ORDER GRANTING SUMMARY JUDGMENT (DKT. NO. 35) AND DENYING AS MOOT MOTION TO
EXCLUDE (DKT. NO. 41) - 22

1   murder does not vitiate the probable cause that existed at the time the affidavit was written, and

2   indeed it does not change the fact that it was Knapp's DNA, not Hinshaw's, that was found on

3   Frasier's body.  As discussed *supra*, a discussion of the results of the comforter testing in the

4   affidavit would not have destroyed probable cause, nor would have different characterizations of

5   Dr. Hamilton's autopsy or Barbara Gould's testimony.  The probable cause was supplied by the

6   forensic evidence linking Knapp to Frasier.  Detective Goudschaal did not need to prove

7   Knapp's guilt beyond a reasonable doubt in his affidavit.

8       The Court further notes that Plaintiff's post-hoc efforts to offer a non-culpable

9   explanation for how his semen was found in the victim's vagina are inconsistent with the

10  evidentiary record.  In deposition, Plaintiff was asked where he had sex with Frasier and he

11  stated "[i]t probably would have been in my van" because "I had a nice van. I had a party van. I

12  had a bed in the back of my van. It was a custom van. A tricked out van."  (Dkt. No. 36-3 at 83.)

13  But when asked then how his semen was found on Frasier's comforter, he flatly responded "I

14  can't explain."  (*Id.*)  Plaintiff's response brief likewise speculates that "Frasier and Knapp could

15  have easily had sex, in the back of Knapp's van, in Omar's (bar) parking lot, before Frasier

16  returned to her apartment shortly thereafter."  (Dkt. No. 46 at 21.)  However, Defendant's expert

17  Dr. Fink opined that it would only be possible to observe the quantity of semen present at the

18  time of Frasier's autopsy if she "never got up from a supine position" after sex.  (Dkt. No. 36-14

19  at 2.)  For that reason, "it is a very unlikely scenario that the sex occurred outside the apartment

20  completely and [Frasier] then moved inside the apartment afterwards."  (*Id.* at 4.)  Dr. Fink also

21  opined that it "if there is recoverable sperm and DNA in the vagina at the posterior fornix . . . it

22  is highly likely that would be evidence of the last episode of intercourse a person had" because

23  otherwise the subsequent intercourse would have displaced the semen present.  (*Id.* at 3.)

24

1   Plaintiff has no medical expert evidence to the contrary.  He disputes Dr. Fink's characterization

2   of the recoverable semen at the autopsy as "copious,"[8] but approvingly cites Dr. Fink's

3   discussion of how semen can be displaced by sex as lending support to the idea that Hinshaw had

4   sex with Frasier after Knapp—completely ignoring Fink's conclusion that Knapp's theory of

5   events is "very unlikely."  (*See* Dkt. No. 46 at 18–19.)  Even if Plaintiff's theory of the case were

6   possible it would not negate the existence of probable cause at the time of the affidavit, but at

7   this point Plaintiff has only offered unfounded speculation to exculpate himself.

8       In sum, no evidence presented in this case has led the Court to a different conclusion than

9   the one reached by Clark County judges in 2019: there was probable cause to arrest Richard

10  Knapp for the murder of Audrey Frasier, and to take a buccal swab from him for DNA analysis.

11          3.  Defendant's Immunity Arguments

12      In light of the above, the Court briefly comments on Defendant's argument that he is

13  entitled to qualified immunity.  That is so, he argues, because in a Fourth Amendment case, "[a]n

14  officer would not be on notice that his or her action was unreasonable unless 'all reasonable

15  officers would agree that there was no probable cause in this instance.'"  (Dkt. No. 35 at 26)

16  (quoting *Johnson v. Barr*, 79 F.4th 996, 1005 (9th Cir. 2023)).  He argues that his actions were

17  reasonable because his supervisor and a deputy prosecutor reviewed and approved the PC

18  affidavit, the DNA evidence linked Knapp to the scene—establishing probable cause by itself,

19  and his predecessor who worked on the case, Detective Barbara Knoeppel, strongly agreed that

20

21

22  [8] The characterization "copious" comes from Detective Stefan, who attended the autopsy.  (Dkt.
    Nos. 48-4 at 29, 40 at 5.)  Plaintiff argues that the first use of the word "copious" came in 2003,
23  eight years after the murder, and is contradicted by Dr. Hamilton's autopsy report, which found a
    "small" amount of material.  (Dkt. Nos. 46 at 17–18; 40 at 8.)  Ultimately, this fact dispute is not
24  material to the disposition of the case; the PC affidavit does not use the term "copious."

ORDER GRANTING SUMMARY JUDGMENT (DKT. NO. 35) AND DENYING AS MOOT MOTION TO
EXCLUDE (DKT. NO. 41) - 24

1    Hinshaw should no longer be considered a suspect.  (Dkt. No. 35 at 26–27) (*see also* Dkt. No.

2    36-3 at 57–60 (Knoeppel's deposition testimony discussing why she excluded Hinshaw)).

3        Plaintiff argues that Defendant cannot claim qualified immunity because the Ninth

4    Circuit has held that "governmental employees are not entitled to qualified immunity on judicial

5    deception claims."  (Dkt. No. 46 at 8) (quoting *Chism*, 661 F.3d at 393).  Defendant replies that

6    Plaintiff's reading of *Chism* is incomplete, and the veil of immunity is only pierced where

7    omitted information was clearly material at the time of the affidavit.  (Dkt. No. 50 at 6–7) (citing

8    *Lombardi v. City of El Cajon*, 117 F.3d 1117, 1126 (9th Cir. 1997)).

9        The qualified immunity analysis largely collapses into the merits discussion of the

10   judicial deception claim.  The *Chism* court explained that qualified immunity is not available

11   where there has been a finding of judicial deception because:

12       if an officer submitted an affidavit that contained statements he knew to be false or would
         have known were false had he not recklessly disregarded the truth and no accurate
13       information sufficient to constitute probable cause attended the false statements, ... he
         cannot be said to have acted in a reasonable manner, and the shield of qualified immunity
14       is lost.

15   661 F.3d at 393 (quoting *Branch v. Tunnell,* 937 F.2d 1382, 1387 (9th Cir. 1991) *overruled on*

16   *other grounds by Galbraith v. Cnty. of Santa Clara,* 307 F.3d 1119 (9th Cir. 2002)).  But here,

17   the Court finds no evidence that Defendant knowingly provided false information or recklessly

18   disregarded the truth in his PC affidavit, and the PC affidavit contained sufficient accurate

19   information to establish probable cause, so there is no constitutional violation.  The Court could

20   end its analysis there.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that courts

21   have discretion to consider the two prongs of qualified immunity, whether a constitutional right

22   was violated and whether that right was clearly established, in either order).  At the second step,

23   the reasonableness of Defendant's actions, the Court agrees with Defendant that even if an after-

24

the-fact review could poke holes in the PC affidavit, it was not so clearly invalid that a

reasonable officer at the time would have known that probable cause did not exist.  *See*

*Lombardi*, 117 F.3d at 1126 ("when it is not plain that a neutral magistrate would not have issued

the warrant, the shield of qualified immunity should not be lost, because a reasonably well-

trained officer would not have known that the misstatement or omission would have any effect

on issuing the warrant.").  To the contrary, as the Court held *supra*, the affidavit establishes

probable cause even if omitted information were added.[9]

## V    MOTION TO EXCLUDE

Defendant has additionally moved to exclude Plaintiff's policing practices expert, Darrell

Robertson.  (Dkt. No. 41.)  In light of the Court's holding granting summary judgment, the

motion is DENIED as moot.

## VI    CONCLUSION

Defendant's motion for summary judgment (Dkt. No. 35) is GRANTED and his motion

to exclude Plaintiff's expert (Dkt. No. 41) is DENIED as moot.  The trial calendar is stricken,

and the Clerk shall close the case and enter judgment.

Dated this 11th day of August, 2025.

David G. Estudillo
United States District Judge

---

[9] The Court does not reach Defendant's argument that he is immune by virtue of the fact that the
prosecutor independently decided to charge Knapp.

ORDER GRANTING SUMMARY JUDGMENT (DKT. NO. 35) AND DENYING AS MOOT MOTION TO
EXCLUDE (DKT. NO. 41) - 26